## NEELY *v.* HENKEL (No. 1).

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK

No. 387.   Argued December 10, 11, 1900.—Decided January 14, 1901.

There is no merit in the contention that Article 401 of the Penal Code of Cuba, which provides that the public employé, who, by reason of his office, has in his charge public funds or property, and takes or consents that others should take any part therefrom, shall be punished, applies only to persons in the public employ of Spain. Spain, having withdrawn from the island, its successor has become "the public," to which the code, remaining unrepealed, now refers.

Within the meaning of the act of June 6, 1900, c. 793, 31 Stat. 656, providing for the surrender of persons committing defined crimes within a foreign country occupied by or under the control of the United States, and fleeing to the United States, or any Territory thereof, or the District of Columbia, Cuba is foreign territory which cannot be regarded in any constitutional, legal or international sense, as a part of the territory of the United States; and this is not affected by the fact that it is under a Military Governor, appointed by and representing the President in the work of assisting the inhabitants of the island in establishing a government of their own.

As between the United States and Cuba that island is territory held in trust for its inhabitants, to whom it rightfully belongs, and to whose exclusive control it will be surrendered when a stable government shall have been established by their voluntary action.

The act of June 6, 1900, is not unconstitutional in that it does not secure to the accused when surrendered to a foreign country for trial all the rights,

privileges and immunities that are guaranteed by the Constitution to persons charged with the commission in this country of crime against the United States.

The provisions in the Constitution relating to writs of *habeas corpus*, bills of attainder, *ex post facto* laws, trial by jury for crimes, and generally to the fundamental guarantees of life, liberty and property embodied in that instrument have no relation to crimes committed without the jurisdiction of the United States, against the laws of a foreign country.

When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States.

The contention that the United States recognized the existence of an established government, known as the Republic of Cuba, but is now using its military or executive power to overthrow it, is without merit.

The act of June 6, 1900, is not in violation of the Constitution of the United States, and this case comes within its provisions; and, the court below having found that there was probable cause to believe the appellant guilty of the offences charged, the order for his extradition was proper, and no ground existed for his discharge on *habeas corpus*.

THE case is stated in the opinion of the court.

*Mr. John D. Lindsay* for appellant. *Mr. De Lancey Nicoll* was on his brief.

*Mr. Assistant Attorney General Beck* for Henkel.

MR. JUSTICE HARLAN delivered the opinion of the court.

By section 5270 of the Revised Statutes of the United States it is provided:

"Whenever there is *a treaty or convention for extradition* between the Government of the United States and any *foreign* government, any justice of the Supreme Court, circuit judge, district judge, commissioner, authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within the limits of any State, District or Territory, with having committed within the jurisdiction of any such foreign government any of the crimes

provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

This section was amended by Congress June 6, 1900, by adding thereto the following proviso:

" *Provided,* That whenever any *foreign* country *or territory,* or any part thereof, *is occupied by or under the control of the United States,* any person who shall violate, or who has violated, the criminal laws *in force therein,* by the commission of any of the following offences, namely: Murder, and assault with intent to commit murder; counterfeiting or altering money, or uttering or bringing into circulation counterfeit or altered money; counterfeiting certificates or coupons of public indebtedness, bank notes, or other instruments of public credit, and the utterance or circulation of the same; forgery or altering, and uttering what is forged or altered; *embezzlement or criminal malversation of the public funds, committed by public officers, employés or depositaries;* larceny or embezzlement of an amount not less than one hundred dollars in value, robbery; burglary, defined to be the breaking and entering by night time into the house of another person with intent to commit a felony therein; and the act of breaking and entering the house or building of another, whether in the day or night time, with the intent to commit a felony therein; the act of entering or of breaking and entering the offices of the government and public authorities, or the offices of banks, banking houses, savings banks, trust companies, insurance or other companies, with the

intent to commit a felony therein; perjury or the subornation of perjury; rape; arson; piracy by the law of nations; murder, assault with intent to kill, and manslaughter, committed on the high seas, on board a ship owned by or in control of citizens or residents of such foreign country or territory and not under the flag of the United States, or of some other government; malicious destruction of or attempt to destroy railways, trams, vessels, bridges, dwellings, public edifices or other buildings, when the act endangers human life, *and who shall depart or flee, or who has departed or fled, from justice therein to the United States, or to any Territory thereof, or to the District of Columbia,* shall, when found therein, be liable to arrest and detention by the authorities of the United States, and *on the written request or requisition of the military governor or other chief executive officer in control of such foreign country or territory shall be returned and surrendered* as hereinafter provided to such authorities for trial under the laws in force *in the place where such offence was committed.* All the provisions of sections fifty-two hundred and seventy to fifty-two hundred and seventy-seven of this title, so far as applicable, shall govern proceedings authorized by this proviso: *Provided further,* That such proceedings shall be had *before a judge of the courts of the United States only, who shall hold such person on evidence establishing probable cause that he is guilty of the offence charged; And provided further,* That no return or surrender shall be made of any person charged with the commission of any offence of a political nature. If so held such person shall be returned and surrendered to the authorities in control of such foreign country or territory on the order of the Secretary of State of the United States, and such authorities shall secure to such person a fair and impartial trial." 31 Stat. 656, c. 793.

On the 28th day of June, 1900, a warrant was issued by Judge Lacombe of the Circuit Court of the United States for the Southern District of New York commanding the arrest of Charles F. W. Neely, who "being then and there a public employé, to wit, Finance Agent of the Department of Posts in the city of Havana, Island of Cuba, on the 6th day of May in the year of our Lord one thousand nine hundred, or about that

time, having then and there charge of the collection and deposit of moneys of the Department of Posts of the said city of Havana, did unlawfully and feloniously take and embezzle from the public funds of the said Island of Cuba the sum of ten thousand dollars and more, being then and there moneys and funds which had come into his charge and under his control in his capacity as such public employé and finance agent, as aforesaid, and by reason of his said office and employment, thereby violating chapter 10, article 401, of the penal code of the said Island of Cuba — that is to say, a crime within the meaning of the said act of Congress, approved June 6, 1900, as aforesaid, relating to the ' embezzlement or criminal malversation of the public funds committed by public officers, employés, or depositaries.' " The warrant directed the accused to be brought before the judge in order that the evidence of probable cause as to his guilt could be heard and considered, and, if deemed sufficient, that the same might be certified with a copy of all the proceedings to the Secretary of State, that an order might issue for his return and surrender pursuant to the authority of the above act of Congress.

The warrant of arrest was based on a verified written complaint of an Assistant United States Attorney for the Southern District of New York.

On the same day and upon a like complaint a warrant was issued against Neely by the same judge, commanding his arrest for the crime of having unlawfully and fraudulently—while employed in and connected with the business and operations of a branch of the service of the Department of Posts in Havana, Cuba, between July 1, 1899, and May 1, 1900—embezzled and converted to his own use postage stamps, moneys, funds and property belonging to and in the custody of that Department which had come into his custody and under his authority as such employé, to the amount of $57,000, in violation of sections 37 and 55 of the Postal Code of Cuba.

Neely having been arrested under these warrants application was made by the United States for his extradition to Cuba. The accused moved to dismiss the complaints upon various grounds. That motion having been denied, the case was heard

upon evidence. In disposing of the application for extradition, Judge Lacombe said: "In the opinion of this court, the Government has abundantly shown that there is probable cause to believe that Neely is guilty of the offence of 'embezzlement or criminal malversation of the public funds,' he being at that time a 'public officer' or 'employé' or 'depositary.' Such an offence is obnoxious to the Penal Code in force in Cuba, Article 401 of which provides that 'the public employé who, by reason of his office, has in his charge public funds or property and who should take (or consent that others should take) any part therefrom, shall be punished,' etc. There is no merit in the contention that this article applies only to persons in the public employ of Spain. Spain having withdrawn from the island, its successor has become the 'public' to which the Code, remaining unrepealed, now refers. The suggestion that under this Penal Code no public employé could be prosecuted or punished until his superior had heard the case and turned the offender over to the criminal law for trial is matter of defence and need not be considered here. The evidence shows probable cause to believe that the prisoner is guilty of an offence defined in the act of June 6, 1900, and which is also a violation of the criminal laws in Cuba, and upon such evidence he will be held for extradition." But, it was further said: "Two obstacles now exist. He [the accused] has been held to bail in this court upon a criminal charge of bringing into this district government funds embezzled in another district. He has also been arrested in a civil action brought in this court to recover $45,000, which, it is alleged, he has converted. When both of these proceedings have been discontinued, the order in extradition will be signed. This may be done on August 13 at 11 A. M."

Subsequently, August 9, 1900, Neely presented in the court below his written application for a writ of *habeas corpus* and prayed that he be discharged from restraint in the extradition proceedings. He claimed on various grounds that the act of June 6, 1900, under which he was arrested, detained and imprisoned was in violation of the Constitution of the United States.

The application for the writ of *habeas corpus* having been

denied and an appeal having been duly taken, the petitioner was remanded to the custody of the marshal to await the determination of such appeal in this court.

I. That at the date of the act of June 6, 1900, the Island of Cuba was "occupied by" and was "under the control of the United States" and that it is still so occupied and controlled, cannot be disputed. This court will take judicial notice that such were, at the date named and are now, the relations between this country and Cuba. So that the applicability of the above act to the present case—and this is the first question to be examined—depends upon the inquiry whether, within its meaning, Cuba is to be deemed a *foreign* country or territory.

We do not think this question at all difficult of solution if regard be had to the avowed objects intended to be accomplished by the war with Spain and by the military occupation of that Island. Let us see what were those objects as they are disclosed by official documents and by the public acts of the representatives of the United States.

On the 20th day of April, 1898, Congress passed a joint resolution, the preamble of which recited that the abhorrent conditions existing for more than three years in the Island of Cuba, so near our own borders, had shocked the moral sense of the people of the United States, had been a disgrace to civilization, culminating in the destruction of a United States battleship, with two hundred and sixty-six of its officers and crew, while on a friendly visit in the harbor of Havana, and could not longer be endured. It was, therefore, resolved: "1. That the people of the Island of Cuba are, and of right ought to be, free and independent. 2. That it is the duty of the United States to demand, and the Government of the United States does hereby demand, that the Government of Spain at once relinquish its authority and government in the Island of Cuba and withdraw its land and naval forces from Cuba and Cuban waters. 3. That the President of the United States be, and he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States, to such extent as may be necessary to carry these resolutions into effect. 4. That the

United States hereby disclaims any disposition or intention to exercise sovereignty, jurisdiction or control over said Island except for the pacification thereof, and asserts its determination, when that is accomplished, to leave the government and control of the Island to its people." 30 Stat. 738.

The adoption of this joint resolution was followed by the act of April 25, 1898, by which Congress declared: "1. That war be, and the same is, hereby declared to exist, and that war has existed since the 21st day of April, 1898, including said day, between the United States of America and the Kingdom of Spain. 2. That the President of the United States be, and he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States, to such extent as may be necessary to carry this act into effect." 30 Stat. 364, c. 189.

The war lasted but a few months. The success of the American arms was so complete and overwhelming that a Protocol of Agreement between the United States and Spain embodying the terms of a basis for the establishment of peace between the two countries was signed at Washington on the 12th of August, 1898. By that agreement it was provided that "Spain will relinquish all claim of sovereignty over and title to Cuba" and that the respective countries would each appoint commissioners to meet at Paris and there proceed to the negotiation and conclusion of a treaty of peace. 30 Stat. 1742.

Commissioners possessing full authority from their respective Governments for that purpose having met in Paris, a Treaty of Peace was signed on December 10, 1898, and ratifications having been duly exchanged it was proclaimed April 11, 1899. 30 Stat. 1754.

That treaty contained among other provisions the following:

"ART. I. Spain relinquishes all claim of sovereignty over and title to Cuba. And as the island is, upon its evacuation by Spain, to be occupied by the United States, the United States will, so long as such occupation shall last, assume and discharge the obligations that may under international law result from the fact of its occupation, for the protection of life and property."

"ART. XVI. It is understood that any obligations assumed in this treaty by the United States with respect to Cuba are limited to the time of its occupancy thereof; but it will upon the termination of such occupancy, advise any government established in the island to assume the same obligations." 30 Stat. 1754–1761.

On the 13th of December, 1898, an order was issued by the Secretary of War stating that, by direction of the President, a division to be known as the Division of Cuba consisting of the geographical departments and provinces of the Island of Cuba, with headquarters at Havana, was created and placed under the command of Major General John R. Brooke, United States Army, who was required, in addition to his command of the troops in the Division, to " exercise the authority of Military Governor of the Island." And on December 28, 1898, General Brooke, by a formal order, in accordance with the order of the President, assumed command of that Division, and announced that he would exercise the authority of Military Governor of the Island.

On the 1st day of January, 1899, at the palace of the Spanish Governor-General in Havana, the sovereignty of Spain was formally relinquished and General Brooke immediately entered upon the full exercise of his duties as Military Governor of Cuba.

Upon assuming the positions of Military Governor and Major General commanding the Division of Cuba, General Brooke issued to the People of Cuba the following proclamation :

" Coming among you as the representative of the President, in furtherance and in continuation of the humane purpose with which my country interfered to put an end to the distressing condition in this island, I deem it proper to say that the object of the present Government is to give protection to the people, security to persons and property, to restore confidence, to encourage the people to resume the pursuits of peace, to build up waste plantations, to resume commercial traffic, and to afford full protection in the exercise of all civil and religious rights. To this end, the protection of the United States Government will be directed, and every possible provision made to carry

out these objects. through the channels of *civil administration, although under military control,* in the interest and for the benefit of all the people of Cuba, and those possessed of rights and property in the island.   The civil and criminal code which prevailed prior to the relinquishment of Spanish sovereignty will remain in force, with such modifications and changes as may from time to time be found necessary in the interest of good government.   The people of Cuba, without regard to previous affiliations, are invited and urged to coöperate in these objects by the exercise of moderation, conciliation, and good-will one toward another, and a hearty accord in our humanitarian purposes will insure kind and beneficent government.   The Military Governor of the Island will always be pleased to confer with those who may desire to consult him on matters of public interest."

On the 11th day of January, 1899, the Military Governor, "in pursuance of the authority vested in him by the President of the United States, and in order to secure a better organization of the civil service in the Island of Cuba," ordered that thereafter "the civil government shall be administered by four Departments, each under the charge of its appropriate Secretary," to be known, respectively, as the Departments of State and Government, of Finance, of Justice and Public Instruction, and of Agriculture, Commerce, Industries and Public Works, each under the charge of a Secretary.   To these Secretaries " were transferred, by the officers in charge of them, the various bureaus of the Spanish civil government."   Subsequently, by order of the Military Governor, a Supreme Court for the island was created, with jurisdiction throughout Cuban territory, composed of a President or Chief Justice, six Associate Justices, one Fiscal, two Assistant Fiscals, one Secretary or Chief Clerk, two Deputy Clerks, and other subordinate employés, with administrative functions, as well as those of a court of justice in civil and criminal matters.   By order of a later date, issued by the Military Governor, the jurisdiction of the ordinary courts of criminal jurisdiction was defined.

Under date of July 21, 1899, by direction of the Military Governor, a code known as the Postal Code was promulgated

and declared to be the law relating to postal affairs in Cuba. That Code abrogated all laws then existing in Cuba inconsistent with its provisions. It provided that the Director General of Posts of the Island should have the control and management of the Department of Posts and prescribed numerous criminal offences, affixing the punishments for each. It is not disputed that one of the offences charged against Neely is included in those defined in the Postal Code established by the Military Governor of Cuba, and that the other is embraced by the Penal Code of that Island which was in force when the war ensued with Spain, and which by order of the Military Governor remained in force, subject to such modifications as might be found necessary in the interest of good government.

On the 13th day of June, 1900, the present Military Governor of Cuba, General Leonard Wood, made his requisition upon the President for the extradition of Neely under the act of Congress.

The facts above detailed make it clear that within the meaning of the act of June 6, 1900, Cuba is foreign territory. It cannot be regarded, in any constitutional, legal or international sense, a part of the territory of the United States.

While by the act of April 25, 1898, declaring war between this country and Spain, the President was directed and empowered to use our entire land and naval forces, as well as the militia of the several States to such extent as was necessary, to carry such act into effect, that authorization was not for the purpose of making Cuba an integral part of the United States but only for the purpose of compelling the relinquishment by Spain of its authority and government in that Island and the withdrawal of its forces from Cuba and Cuban waters. The legislative and executive branches of the Government, by the joint resolution of April 20, 1898, expressly disclaimed any purpose to exercise sovereignty, jurisdiction or control over Cuba "except for the pacification thereof," and asserted the determination of the United States, that object being accomplished, to leave the government and control of Cuba to its own people. All that has been done in relation to Cuba has had that end in view and, so far as the court is informed by the public history of the re-

lations of this country with that Island, nothing has been done inconsistent with the declared object of the war with Spain.

Cuba is none the less foreign territory, within the meaning of the act of Congress, because it is under a Military Governor appointed by and representing the President in the work of assisting the inhabitants of that island to establish a government of their own, under which, as a free and independent people, they may control their own affairs without interference by other nations. The occupancy of the Island by troops of the United States was the necessary result of the war. That result could not have been avoided by the United States consistently with the principles of international law or with its obligations to the people of Cuba.

It is true that as between Spain and the United States—indeed, as between the United States and all foreign nations—Cuba, upon the cessation of hostilities with Spain and after the Treaty of Paris was to be treated as if it were conquered territory. But as between the United States and Cuba that Island is territory held in trust for the inhabitants of Cuba to whom it rightfully belongs and to whose exclusive control it will be surrendered when a stable government shall have been established by their voluntary action.

In his message to Congress of December 6, 1898, the President said that "as soon as we are in possession of Cuba and have pacified the Island, it will be necessary to give aid and direction to its people to form a government for themselves," and that "until there is complete tranquillity in the Island and a stable government inaugurated, military occupation will be continued." Nothing in the Treaty of Paris stands in the way of this declared object, and nothing existed, at the date of the passage of the act of June 6, 1900, indicating any change in the policy of our Government as defined in the joint resolution of April 20, 1898. In reference to the declaration in that resolution of the purposes of the United States in relation to Cuba, the President in his annual message of December 5, 1899, said that the pledge contained in it "is of the highest honorable obligation, and must be sacredly kept." Indeed, the Treaty of Paris contemplated only a temporary occupancy and

control of Cuba by the United States. While it was taken for granted by the treaty that upon the evacuation by Spain, the island would be occupied by the United States, the treaty provided that "so long as such occupation shall last" the United States should "assume and discharge the obligations that may, under international law, result from the fact of its occupation for the protection of life and property." It further provided that any obligations assumed by the United States, under the treaty, with respect to Cuba, were "limited to the time of its occupancy thereof," but that the United States, upon the termination of such occupancy, should "advise any government established in the Island to assume the same obligations."

It cannot be doubted that when the United States enforced the relinquishment by Spain of her sovereignty in Cuba and determined to occupy and control that island until there was complete tranquillity in all its borders and until the people of Cuba had created for themselves a stable government, it succeeded to the authority of the displaced government so far at least that it became its duty under international law and pending the pacification of the Island, to protect in all appropriate legal modes the lives, the liberty and the property of all those who submitted to the authority of the representatives of this country. That duty was recognized in the Treaty of Paris and the act of June 6, 1900, so far as it applied to cases arising in Cuba, was in aid or execution of that treaty and in discharge of the obligations imposed by its provisions upon the United States. The power of Congress to make all laws necessary and proper for carrying into execution as well the powers enumerated in section 8 of article I of the Constitution, as all others vested in the Government of the United States, or in any Department or the officers thereof, includes the power to enact such legislation as is appropriate to give efficacy to any stipulations which it is competent for the President by and with the advice and consent of the Senate to insert in a treaty with a foreign power. What legislation by Congress could be more appropriate for the protection of life and property in Cuba, while occupied and controlled by the United States, than legislation securing the return to that island, to be tried by its

constituted authorities, of those who having committed crimes there fled to this country to escape arrest, trial and punishment? No crime is mentioned in the extradition act of June 6, 1900, that does not have some relation to the safety of life and property. And the provisions of that act requiring the surrender of any public officer, employé or depositary fleeing to the United States after having committed in a foreign country or territory occupied by or under the control of the United States the crime of "embezzlement or criminal malversation of the public funds" have special application to Cuba in its present relations to this country.

We must not be understood, however, as saying that but for the obligation imposed by the Treaty of Paris upon the United States to protect life and property in Cuba pending its occupancy and control of that island, Congress would have been without power to enact such a statute as that of June 6, 1900, so far as it embraced citizens of the United States or persons found in the United States who had committed crimes in the foreign territory so occupied and controlled by the United States for temporary purposes. That question is not open on this record for examination, and upon it we express no opinion. It is quite sufficient in this case to adjudge, as we now do, that it was competent for Congress, by legislation, to enforce or give efficacy to the provisions of the treaty made by the United States and Spain with respect to the Island of Cuba and its people.

II. It is contended that the act of June 6, 1900, is unconstitutional and void in that it does not secure to the accused, when surrendered to a foreign country for trial in its tribunals, all of the rights, privileges and immunities that are guaranteed by the Constitution to persons charged with the commission in this country of crime against the United States. Allusion is here made to the provisions of the Federal Constitution relating to the writ of *habeas corpus* bills of attainder, *ex post facto* laws, trial by jury for crimes, and generally to the fundamental guarantees of life, liberty and property embodied in that instrument. The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.

In connection with the above proposition, we are reminded of the fact that the appellant is a citizen of the United States. But such citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated and from whose justice he has fled. When an American citizen commits a crime in a foreign country he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States. By the act in question the appellant cannot be extradited except upon the order of a judge of a court of the United States and then only upon evidence establishing probable cause to believe him guilty of the offence charged; and when tried in the country to which he is sent, he is secured by the same act " a fair and impartial trial "—not necessarily a trial according to the mode prescribed by this country for crimes committed against its laws, but a trial according to the modes established in the country where the crime was committed, provided such trial be had without discrimination against the accused because of his American citizenship. In the judgment of Congress these provisions were deemed adequate to the ends of justice in cases of persons committing crimes in a foreign country or territory " occupied by or under the control of the United States," and subsequently fleeing to this country. We cannot adjudge that Congress in this matter has abused its discretion, nor decline to enforce obedience to its will as expressed in the act of June 6, 1900.

III. Another contention of the appellant is that as Congress, by the joint resolution of April 20, 1898, declared that "the people of Cuba are, and of right ought to be free and independent" and as peace has existed since, at least, the military forces of Spain evacuated Cuba on or about January, 1899, the occupancy and control of that island, under the military authority of the United States is without warrant in the Constitution and an unauthorized interference with the internal affairs of a friendly power; consequently it is argued the appellant

should not be extradited for trial in the courts established under the orders issued by the Military Governor of the Island. In support of this proposition it is said that the United States recognized the existence of the Republic of Cuba, and that the war with Spain was carried on jointly by the allied forces of the United States and of that Republic.

Apart from the view that it is not competent for the judiciary to make any declaration upon the question of the length of time during which Cuba may be rightfully occupied and controlled by the United States in order to effect its pacification—it being the function of the political branch of the Government to determine when such occupation and control shall cease, and therefore when the troops of the United States shall be withdrawn from Cuba—the contention that the United States recognized the existence of an established government known as the Republic of Cuba, but is now using its military or executive power to displace or overthrow it, is without merit. The declaration by Congress that the people of Cuba were and of right ought to be free and independent was not intended as a recognition of the existence of an organized government instituted by the people of that Island in hostility to the government maintained by Spain. Nothing more was intended than to express the thought that the Cubans were entitled to enjoy —to use the language of the President in his message of December 5, 1897—that "measure of self control which is the inalienable right of man, protected in their right to reap the benefit of the exhaustless treasure of their country." In the same message the President said: "It is to be seriously considered whether the Cuban insurrection possesses beyond dispute the attributes of statehood, which alone can demand the recognition of belligerency in its favor. The same requirement must certainly be no less seriously considered when the graver issue of recognizing independence is in question." Again, in his message of April 11, 1898, referring to the suggestion that the independence of the Republic of Cuba should be recognized before this country entered upon war with Spain, he said: "Such recognition is not necessary in order to enable the United States to intervene and pacify the island. To commit this country

now to the recognition of any particular government in Cuba might subject us to embarrassing conditions of international obligation toward the organization to be recognized. In case of intervention our conduct would be subject to the approval or disapproval of such government. We should be obliged to submit to its direction and to assume to it the mere relation of a friendly ally." To this may be added the significant fact that the first part of the joint resolution as originally reported from the senate committee read as follows: "That the people of the Island of Cuba are and of right ought to be free and independent, *and that the Government of the United States hereby recognizes the Republic of Cuba as the true and lawful government of the Island.*" But upon full consideration the views of the President received the sanction of Congress, and the words in italics were stricken out. It thus appears that both the legislative and executive branches of the government concurred in not recognizing the existence of any such government as the Republic of Cuba. It is true that the coöporation of troops commanded by Cuban officers was accepted by the military authorities of the United States in its efforts to overthrow Spanish authority in Cuba. Yet from the beginning to the end of the war the supreme authority in all military operations in Cuba and in Cuban waters against Spain was with the United States, and those operations were not in any sense under the control or direction of the troops commanded by Cuban officers.

We are of opinion, for the reasons stated, that the act of June 6, 1900, is not in violation of the Constitution of the United States, and that this case comes within the provisions of that act. The court below having found that there was probable cause to believe the appellant guilty of the offences charged, the order for his extradition was proper, and no ground existed for his discharge on *habeas corpus.*

The judgment of the Circuit Court is, therefore,

*Affirmed.*