(117 App. Div. 411)
          PEOPLE ex rel. KOPEL v. BINGHAM, Police Com'r.

(Supreme Court, Appellate Division, First Department.    February 8, 1907.)

EXTRADITION—INTERSTATE EXTRADITION—AUTHORITY TO DELIVER PERSON AC-
          CUSED—DELIVERY TO THE TERRITORIES.
          Rev. St. U. S. § 5278 [U. S. Comp. St. 1901, p. 3597], provides that when-
     ever the executive authority of any state or territory demands any person
     as a fugitive from justice of the executive authority of any state or terri-
     tory to which such person has fled, it shall be the duty of the executive
     authority of the latter state or territory to cause the fugitive to be deliv-
     ered.    Section 5270 [U. S. Comp. St. 1901, p. 3591] provides for the extra-
     dition of a fugitive from justice to a foreign country and for the extra-
     dition of persons who have fled to the United States from any territory
     occupied by or under the control of the United States; the provisions all
     relating to the surrender by the Secretary of State, and the proceedings
     for the delivery of one fleeing from the territory under the control of the
     United States being exclusively within the jurisdiction of the United
     States courts.    By the treaty of Paris the island of Porto Rico was ceded
     to the United States, and Act April 12, 1900, c. 191, 31 Stat. 77, provided
     for the appointment of a Governor of the island, established a judicial sys-
     tem, and provided that the Governor should have all the powers of the
     Governors of the territories of the United States.    Code Cr. Proc. § 827,
     provides the procedure whereby fugitives from justice fleeing to the state
     of New York are to be delivered on a requisition on the Governor by the
     Governor of any other state or territory.    Held, that the extradition of
     one fleeing from the island of Porto Rico to the state of New York was
     governed by Rev. St. U. S. § 5278, and Code Cr. Proc. § 827.

Appeal from Special Term.
Habeas corpus by the people, on the relation of Abraham Kopel, to obtain relator's release from the custody of Theodore A. Bingham, as police commissioner.    From an order dismissing the writ and re-manding relator to custody, he appeals.    Affirmed.
Argued before PATTERSON, P. J., and McLAUGHLIN, INGRA-HAM, LAUGHLIN, and HOUGHTON, JJ.

Albert R. Page, for appellant.
Robert Johnstone, Deputy Asst. Dist. Atty., for respondent.

INGRAHAM, J.    It seems to have been held by the Court of Ap-peals in People ex rel. Corkran v. Hyatt, 172 N. Y. 176, 64 N. E. 825, 66 L. R. A. 774, 92 Am. St. Rep. 706, that no person can or should be extradited from one state to another unless the case falls within the federal Constitution or statutes, and that the power which independent nations have to surrender criminals to other nations as a matter of favor or comity is not possessed by the states.    The Constitution of the United States provides (article 4, § 2, subd. 2) that:

"A person charged 'in any state, with treason, felony or other crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime."

Under this clause of the Constitution Congress has enacted (section 5278, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3597]) that:

"Whenever the executive authority of any state or territory demands any person as a fugitive from justice, of the executive authority of any state or territory to which such person has fled, * * * it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured * * * and to cause the fugitive to be delivered."

· Section 5270, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3591] provides for the extradition of fugitives from justice to a foreign country. This section contains a provision that was added in 1900 (Act June 6, 1900, c. 793, 31 Stat. 656 [U. S. Comp. St. 1901, p. 3591]) which provides that:

"Whenever any foreign country or territory, or any part thereof, is occupied by or under the control of the United States, any person who shall violate, or who has violated, the criminal laws in force therein, by the commission of any of the following offenses: [Then follows an enumeration of the offenses]—and shall depart or flee, or who has departed or fled from justice therein to the United States, any territory thereof or to the District of Columbia, shall, when found therein, be liable to arrest and detention by the authorities of the United States and on the written request or requisition of the military governor or other chief executive officer in control of such foreign country or territory shall be returned and surrendered as hereinafter provided to such authorities for trial and under the laws in force in the place where such offense was committed. * * * Provided further, that such proceedings shall be had before a judge of the courts of the United States only, who shall hold such person on evidence establishing probable cause that he is guilty of the offense charged. * * * If so held such person shall be returned and surrendered to the authorities in control of such foreign country or territory on the order of the Secretary of State of the United States."

It was further provided that the provisions of sections 5270–5277, Rev. St. U. S. [U. S. Comp. St. 1901, pp. 3591–3597] as far as applicable, shall govern proceedings authorized by this proviso. These provisions all relate to the surrender of a fugitive from justice by the Secretary of State to the government of a foreign country, and have no relation to the surrender of fugitives from justice from one portion of the United States to another. Section 5278, Rev. St. U. S., then provides that:

"Whenever the executive authority of any state or territory demands any person as a fugitive from justice of the executive authority of any state or territory to which such person has fled, * * * it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured, * * * and to cause the fugitive to be delivered to such agent when he shall appear."

This provision of the Revised Statutes was originally passed on February 12, 1793, and it seems to have been in force from that time to the present.

By section 827 of the Code of Criminal Procedure it is provided that:

"It shall be the duty of the Governor, in all cases where by virtue of a requisition made upon him by the Governor of another state or territory, any

citizen, inhabitant or temporary resident of this state is to be arrested, as a fugitive from justice * * * to issue and transmit a warrant for such purpose to the sheriff of the proper county * * * (except in the city and county of New York, where such warrant shall only be issued to the superintendent or any inspector of police). Before any officer to whom such warrant shall be directed or intrusted shall deliver the person arrested into the custody of the agent or agents named in the warrant of the Governor of this state, such officer must, unless the same be waived, as hereinafter stated, take the prisoner or prisoners before a judge of the Supreme Court, or a county judge, who shall, in open court, if in session, otherwise at chambers, inform the prisoner or prisoners of the cause of his or their arrest"

—And that he or they may have a writ of habeas corpus, upon filing an affidavit to the effect that he or they are not the person or persons mentioned in said requisition.

The question presented in this case would therefore seem to be whether Porto Rico is a state or territory, within section 5278, Rev. St. U. S., or a foreign country or territory occupied by or under the control of the United States. In the latter case the extradition must be under the provisions of section 5270, Rev. St. U. S.; while, if Porto Rico is a territory of the United States, the relator may be extradited under section 827 of the Code of Criminal Procedure, to which attention has been called.

The proviso added to section 5270, Rev. St. U. S., by Act June 6, 1900, c. 793, 31 Stat. 656 [U. S. Comp. St. 1901, p. 3591], was construed in Neely v. Henkel, 180 U. S. 109, 21 Sup. Ct. 302, 45 L. Ed. 448. That case presented the question of the apprehension of a fugitive from justice from the island of Cuba, and it was held that Cuba was, at the time this decision was rendered, occupied by and under the control of the United States, of which the court would take judicial notice. Attention was then called to the treaty of peace between the United States and Spain, and it was held that, under this treaty and the acts of the military authorities of the United States under it, the island of Cuba was foreign territory within the meaning of this amendment to section 5270, Rev. St. U. S., and could not be regarded, in any constitutional, legal, or international sense, part of the United States. . The court there said:

"It is true that as between Spain and the United States—indeed, as between the United States and all foreign nations—Cuba, upon the cessation of hostilities with Spain and after the treaty of Paris, was to be treated as if it were conquered territory. But as between the United States and Cuba that island is territory held in trust for the inhabitants of Cuba, to whom it rightfully belongs and to whose exclusive control it will be surrendered when a stable government shall have been established by their voluntary action. * * * Indeed, the treaty of Paris contemplated only a temporary occupancy and control of Cuba by the United States."

It seems from the whole discussion in this case that the provision of section 5270, Rev. St. U. S., would not have been applicable if Cuba had become territorially a part of the United States, and that the proviso of that section requiring the surrender of public officers, employés, or depositaries fleeing to the United States after having committed in a foreign country or any part thereof occupied by or under the control of the United States the crime of embezzlement or criminal malversation of the public funds, had special application to Cuba in its

present relation to this country. By the treaty of Paris, however, the island of Porto Rico was expressly ceded to the United States. The ninth article of that treaty provided that:

"The civil rights and political status of the native inhabitants of the territory hereby ceded to the United States [Porto Rico] shall be determined by Congress."

By section 1977 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 1259] it is provided that:

"All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other."

After the treaty of Paris Congress passed an act for the government of Porto Rico. Act April 12, 1900, c. 191, 31 Stat. 77. This act was entitled "An act temporarily to provide revenues and a civil government for Porto Rico, and for other purposes," and created all the inhabitants continuing to reside in Porto Rico, except such as elected to preserve their allegiance to the crown of Spain, together with such citizens of the United States as resided in Porto Rico, a body politic under the name of the "People of Porto Rico," to whom governmental powers were thereinafter conferred. It was then provided that all the statutory laws of the United States, except the internal revenue laws, should have the same force and effect in Porto Rico as in the United States, and provision was made for the appointment of a Governor by the President and for a legislative assembly, one branch of which was to be elected by the qualified voters of Porto Rico. All laws enacted by this legislative assembly were to be reported to Congress, who should have power and authority to annul the same. A complete judiciary system was established, with provision for writs of error to the Supreme Court of the United States in the same manner, under the same regulations, and in the same cases as from territories of the United States. By the operation of the treaty of Paris the island of Porto Rico therefore became territorially a part of the United States. It was ceded to the United States by that treaty, and since that time has been the property of the United States, the same as the Northwest Territory became the property of the United States, as the Louisiana Territory became the property of the United States by the treaty with France in 1803, and the territory acquired by the treaty of peace between the United States and Mexico. Upon the organization by the United States of the various governments of each of these territories, they became territorial governments under the control of the United States, and under the express provisions of article 4, § 3, subd. 2, of the federal Constitution, which provides that:

"The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

Congress had the power to prescribe such government for these various territorial possessions as seemed to it appropriate to insure

good government. When, therefore, Porto Rico was acquired by the government of the United States by virtue of the concession contained in the treaty of Paris, the sovereignty of that island vested in the United States, and Congress had power to provide for its government in such manner as it was conceived would best subserve the principles of the Constitution. When it created such a government under the authority of the United States, providing for the appointment of a Governor by the President and Senate, a legislative body to exercise the legislative powers, and a judiciary to exercise the judicial powers within the territorial limits of the island, I can see no reason why that island did not then become a territory of the United States, with the same effect as other territories acquired by the United States and divided into separate territories governed as provided by law. It seems to me that there is no fundamental distinction between a territory organized by the United States from the property acquired from France or Mexico, and the territorial government organized by the United States from property acquired by the United States from Spain by the treaty of Paris. When the United States organized a government for the island of Porto Rico, with executive, legislative, and judicial powers, a territory was created subject to the jurisdiction of the United States, and thus came directly within the provisions of the laws of the United States relating to territories. Porto Rico has ceased to be a "foreign country or territory," and has become a part of the territory of the United States, and when the United States organized a government under its jurisdiction and control for that island it then became, within the meaning of all provisions of law regulating territories, a territory of the United States.

I think this status of the government of Porto Rico is fairly recognized by the Supreme Court of the United States in De Lima v. Bidwell, 182 U. S. 1, 21 Sup. Ct. 743, 45 L. Ed. 1041. In the opinion in that case there is a statement of the various territories that have been acquired by the United States and the action of the government in taking possession of and governing these territories until regular territorial governments were established by Congress. After considering the effect of the treaty of Paris, the court said (page 196 of 182 U. S., page 752 of 21 Sup. Ct. [45 L. Ed. 1041]):

"It follows from this that by the ratification of the treaty of Paris the island became territory of the United States, although not an organized territory in the technical sense of the word. * * * Whatever be the source of this power, its uninterrupted exercise by Congress for a century, and the repeated declarations of this court, have settled the law that the right to acquire territory involves the right to govern and dispose of it. * * * Under this power Congress may deal with territory acquired by treaty; it may administer its government as it does that of the District of Columbia; it may organize a local territorial government; it may admit it as a state upon an equality with other states; it may sell its public lands to individual citizens or may donate them as homesteads to actual settlers. In short, when once acquired by treaty, it belongs to the United States, and is subject to the disposition of Congress."

And the conclusion of the court was that Porto Rico was not a foreign country, but a territory of the United States. Although there was in that case a strong dissent, it was based upon the position taken

that Porto Rico occupied a relation to the United States between that of being a foreign country absolutely and that of being a domestic territory absolutely, and because of that relation its product was subject to the duties imposed by the Dingley act. The whole discussion turned upon the condition of Porto Rico between the time of the ratification of the treaty of Paris and the legislation by Congress establishing a government for that island. When Congress established a civil government for the island of Porto Rico under the control and authority of the United States, a territorial government was established under which Porto Rico became an organized territory of the United States. It ceased to be a foreign country or territory upon the ratification of the treaty of Paris between the United States and Spain. It became an organized territory of the United States when the United States established a form of government under which the island was to be governed, subject to the jurisdiction of Congress and officers appointed in pursuance of law establishing a territorial government.

I think, therefore, it became a territory, within the provisions of section 5278, Rev. St. U. S.; and it follows that the order appealed from should be affirmed.

McLAUGHLIN and LAUGHLIN, JJ., concur.

PATTERSON, P. J.  I concur in the views as expressed by Mr. Justice INGRAHAM, concerning the status of the island of Porto Rico as a territory of the United States; and while it is not expressly decided in De Lima v. Bidwell, 182 U. S. 1, 21 Sup. Ct. 743, 45 L. Ed. 1041, and Downes v. Bidwell, 182 U. S. 244, 21 Sup. Ct. 770, 45 L. Ed. 1088, yet it seems to have been assumed, throughout the opinions written by the learned justices of the Supreme Court of the United States in those cases, that such island is a territory, although not a part of the United States within the revenue clause of the Constitution. I am inclined, however, to the view that it is not necessary to determine, on the appeal now pending before us, whether the island of Porto Rico is an incorporated territory. It is an organized territory, with a government established by the Congress by a law which it was authorized to enact. "Until Congress shall see fit to incorporate territory ceded by treaty into the United States, we regard it as settled by that decision [Downes v. Bidwell, 182 U. S. 244, 21 Sup. Ct. 770, 45 L. Ed. 1088] that the territory is to be governed under the power existing in Congress to make laws for such territories," etc. Dorr v. United States, 195 U. S. 138–143, 24 Sup. Ct. 808, 49 L. Ed. 128.

It seems to me that the authority of the Congress to legislate for the return of fugitives from justice to the authorities of Porto Rico is to be found in the power last referred to. The question here is whether the governor of Porto Rico had the right to call upon the governor of the state of New York for the surrender of the relator, and whether the duty was incumbent upon the governor of the state of New York to comply with such a demand. The Congress of the United States established a complete governmental scheme for the island of Porto Rico, which included an executive head called the "Governor." By an ex-

press provision of the law creating that governmental establishment, passed April 12, 1900 (31 Stat. 81, c. 191, § 17), and commonly called the "Foraker Act," it is required that the governor of Porto Rico shall at all times faithfully execute the laws and he shall in that behalf have all the powers of governors of the territories of the United States that are not locally inapplicable. By section 5278 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3597] it is enacted that:

"Whenever the executive authority of any state or territory demands any person as a fugitive from justice of the executive authority of any state or territory to which such person has fled, * * * it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand or to the agent of such authority appointed to receive the fugitive and to cause the fugitive to be delivered to such agent when he shall appear."

The governor of Porto Rico had the power to proceed under this section of the Revised Statutes by force of the terms of section 17 of the act of April 12, 1900.

It is charged against the present relator that he is the subject of a criminal prosecution by "the People of Porto Rico," and the governor of Porto Rico, being invested by the Congress with the authority of a governor of a territory of the United States, has, in the performance of the duty and obligation resting upon him to execute the laws of the island of Porto Rico, demanded the surrender or rendition of the relator to the proper authorities of that island. Unless it must be held that the provisions of section 5278 of the Revised Statutes of the United States are locally inapplicable to the island of Porto Rico, it seems to me that the clear authority for the demand and surrender of the relator is shown to exist by force of the act of the Congress passed in pursuance of its power to legislate. The provisions of section 5278 of the Revised Statutes of the United States are general and relate to all territories. They are just as applicable to one as to another. They cannot by any proper understanding of language be regarded as only locally applicable to a particular territory with a permitted particular form of organized or incorporated government.

LAUGHLIN and HOUGHTON, JJ., concur.