KAVANAUGH, Circuit Judge,
concurring:
I agree with and join the persuasive opinion of the Court. Under current law, the U.S. Government may transfer Guantanamo detainees to the custody of foreign nations without judicial intervention — at least so long as the Executive Branch declares, as it has for the Guantanamo de *517 tainees, that the United States will not transfer “an individual in circumstances where torture is likely to result.” Munaf v. Geren, — U.S. -, 128 S.Ct. 2207, 2226, 171 L.Ed.2d 1 (2008).
I write separately to emphasize three points.
First, our disposition does not preclude Congress from further regulating the Executive’s transfer of wartime detainees to the custody of other nations. Congress possesses express constitutional authority to make rules concerning wartime detainees. See, e.g., U.S. Const, art. I, § 8 (“Congress shall have Power ... To ... make Rules concerning Captures on Land and Water”). The constitutional text, Justice Jackson’s Youngstown opinion, and recent Supreme Court precedents indicate that the President does not possess exclusive, preclusive authority over the transfer of detainees. See Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006); Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 634, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Except perhaps in a genuine, short-term emergency, the President must comply with legislation regulating or restricting the transfer of detainees. In other words, under the relevant precedents, the President does not have power to trump legislation regarding wartime transfers in a Youngstown category-three situation. To be sure, there are weighty policy reasons why Congress may not seek to restrict the Executive’s transfer authority or to involve the Judiciary in reviewing war-related transfers. That presumably explains why Congress has not done so. But to the extent Congress wants to place judicially enforceable restrictions on Executive transfers of Guantanamo or other wartime detainees, it has that power.
Second, in the absence of a meritorious statutory claim,[1] the detainees argue that they have a constitutional due process right against “transfer to torture” — and, therefore, to judicial reassessment of the Executive’s conclusion that transfer to a foreign nation’s custody is unlikely to result in torture. But both Munaf and the deeply rooted “rule of non-inquiry” in extradition cases require that we defer to the Executive’s considered judgment that transfer is unlikely to result in torture. Those precedents compel us to reject the detainees’ argument that the court second-guess the Executive’s conclusion in this case.
In Munaf, in response to a similar due process claim, the Supreme Court unanimously held that the Judiciary may not “second-guess” the Executive’s assessment that transferred detainees are unlikely to be tortured by the receiving nation (in that case, by Iraq, where the detainees were to be prosecuted in Iraqi courts). 128 S.Ct. at 2226.[2] The Munaf decision applies here a fortiori: That case involved transfer of *518 American citizens, whereas this case involves transfer of alien detainees with no constitutional or statutory right to enter the United States.
Similarly, the longstanding rule of non-inquiry in extradition eases undermines the detainees’ argument. When the Executive seeks extradition pursuant to a request from a foreign nation, the Judiciary does not inquire into the treatment or procedures the extradited citizen or alien will receive in that country. “It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds.” Ahmad v. Wigen, 910 F.2d 1063, 1067 (2d Cir.1990); see also Neely v. Henkel, 180 U.S. 109, 122-23, 21 S.Ct. 302, 45 L.Ed. 448 (1901); Hoxha v. Levy 465 F.3d 554, 563 (3d Cir.2006); United States v. Kin-Hong, 110 F.3d 103, 110-11 & nn. 11-12 (1st Cir.1997); Lopez-Smith v. Hood, 121 F.3d 1322, 1326-27 (9th Cir.1997); Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 CORNELL L.Rev. 1198 (1991).[3]
Therefore, with respect to international transfers of individuals in U.S. custody, Munaf and the extradition cases have already struck the due process balance between the competing interests of the individual and the Government. That balance controls here.[4] The detainees’ interest in avoiding torture or mistreatment by a foreign nation is the same “matter of serious concern” at issue in Munaf and the extradition cases. Munaf, 128 S.Ct. at 2225. And on the other side of the ledger, the Government’s interest in transferring these detainees to foreign nations without judicial second-guessing is at least as compelling as in those cases. Cf. id. at 2224- *519 25 (noting significant governmental interest in detainee transfers connected to “the Executive’s ability to conduct military operations abroad”).
The detainees counter that the Government’s transfer interest in this case involves non-enemy combatants and is therefore less important than in Munaf and the extradition cases; they further hint that transfer without their consent would be without legal authority. Those arguments are incorrect for two separate reasons.
To begin with, even if this were just a standard immigration case involving inadmissible aliens at the U.S. border, the governmental interest in transfer would be compelling. Like Guantanamo detainees, inadmissible aliens at the border or a U.S. port of entry have no constitutional right to enter the United States. See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210-13, 73 S.Ct. 625, 97 L.Ed. 956 (1953); see also id. at 222-23 (Jackson, J., dissenting) (agreeing with majority that there is no constitutional right for an alien to enter the United States); Kiyemba v. Obama, 555 F.3d 1022 (D.C.Cir.2009). In those cases, the United States has a very strong interest in returning the aliens to their home countries or safe third countries so that they will not be detained indefinitely in facilities run by the United States — a scenario that can trigger a host of security, foreign policy, and domestic complications. Cf. 8 C.F.R. §§ 241.13, 241.14. That governmental interest applies at least as strongly in the case of these Guantanamo detainees.
In addition, and more fundamentally, this is a case involving transfer of wartime alien detainees. Transfers are a traditional and lawful aspect of U.S. war efforts. When waging war, the United States captures and detains enemy combatants. The United States may hold enemy combatants for the duration of hostilities, and it of course may prosecute unlawful enemy combatants. See Hamdi, 542 U.S. at 518-19, 124 S.Ct. 2633 (plurality opinion). At the conclusion of hostilities, the United States ordinarily transfers or releases lawful combatant detainees to their home countries. Most relevant in this case, when the United States determines during an ongoing war that an alien no longer needs to be detained or has been mistakenly detained — for example, if he is a noncombatant and not otherwise subject to confinement — the United States attempts to promptly transfer or release that detainee to his home country or a safe third country. Cf. Army Regulation 190-8 § 1-6(10)(c) (person who is captured and determined to be “innocent civilian should be immediately returned to his home or released”); id. §§ 3-11 to 3-14 (transfer and repatriation of prisoners of war); id. § 6-15 (transfer of civilian internees).[5]
Throughout the 20th Century, the United States transferred or released hundreds of thousands of wartime alien detainees— some of whom had been held in America— back to their home countries or, in some *520 cases, to other nations.[6] Those transfer and exchange decisions rested then — as they do now — on confidential information, promises, and negotiations. They involved predictive, expert judgments about conditions in a foreign country and related matters. Given those sensitivities, as well as the delays and burdens associated with obtaining judicial pre-approval of transfers and transfer agreements, it comes as no surprise that war-related transfers traditionally have occurred without judicial oversight. See Boumediene, 128 S.Ct. at 2248-49 (negotiated exchange of prisoners was “a wartime practice well known to the Framers,” and “[jjudicial intervention might have complicated” those negotiations). As both history and modern practice demonstrate, the capture, detention, possible trial, and eventual transfer or release of combatants — as well as the transfer or release of those mistakenly detained during wartime — are all necessary and traditional incidents of war impheating compelling governmental interests. See Hamdi, 542 U.S. at 518-19, 124 S.Ct. 2633 (plurality opinion); cf. Authorization for Use of Military Force, Pub.L. No. 107-40, 115 Stat. 224 (2001).
In short, Munaf and the extradition cases have already weighed the relevant due process considerations regarding transfers. They have established that “the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is.” Munaf, 128 S.Ct. at 2226. And the “Judiciary is not suited to second-guess such determinations.” Id. In light of those precedents, it would be quite anomalous for courts, absent congressional direction, to second-guess such Executive assessments in these war-related transfer cases, where the governmental interest is at least as compelling and the individual interest in avoiding mistreatment is the same. See Al-Anazi v. Bush, 370 F.Supp.2d 188, 194-95 (D.D.C.2005) (Bates, J.); see generally The Supreme Court, 2008 Term — Leading Cases, 122 Harv. L.Rev. 415 (2008) (analyzing Munaf and collecting authorities).
Third, I respectfully offer a few comments about the dissent.
The dissent does not address the fundamental issue raised in this appeal: whether the Constitution’s Due Process Clause (or the Foreign Affairs Reform and Restructuring Act, see Maj. Op. at 514-15) requires judicial reassessment of the Executive’s determination that a detainee is not likely to be tortured by a foreign nation— and whether, in order to ensure such a judicial inquiry, the Government must notify the district court before transfer. Rather, the dissent discusses a question that was not raised by the parties and fashions a new legal rule seemingly out of whole cloth. According to the dissent, a court must prevent a transfer of an alien detainee to a foreign nation’s custody if it concludes that prosecution or detention by the foreign nation would also amount to continued detention “on behalf of the United States.” Dis. Op. at 518. The detain *521 ees did not advance that position in their 104 pages of briefing in this Court (except perhaps an ambiguous reference at the tail end of one sentence in a supplemental brief). Nor did the detainees raise the point during two lengthy oral arguments in this Court. And because the detainees did not make the argument, the Government has not been able to address and respond to the dissent’s novel approach.
In any event, I respectfully disagree with the dissent’s theory. The Government represents that a foreign nation’s prosecution or detention in the wake of a transfer to that nation’s custody would take place “pursuant to its own laws.” Waxman Deck ¶ 5. Under the principles of Munaf, that declaration suffices to demonstrate that the proposed transfer of an alien to the custody of a foreign nation is not the same thing as the U.S. Government’s maintaining the detainee in U.S. custody.[7]
The dissent cites no precedent — none— requiring or allowing a court to review a proposed transfer and assess whether custody of such an alien by a foreign nation would somehow also amount to custody “on behalf of the United States.” The dearth of citations is noteworthy, particularly given that transfers of inadmissible or removed aliens to the custody of foreign nations have long occurred in the immigration context.
Furthermore, the dissent does not define or explain its proposed standard. What does “on behalf of the United States” mean in the context of a foreign nation’s custody of an alien detainee? Does that concept apply to any negotiated transfer of an alien detainee? Does the dissent mean to prevent transfer from Guantanamo whenever the United States seeks or becomes aware of prosecution or detention of an alien by the receiving country pursuant to that country’s laws? The dissent does not say.
The dissent in places seems to imply that an alien who is not an enemy combatant is perforce not dangerous, as that term is used in immigration practice, and that prosecution or detention by a foreign nation after transfer therefore would be improper, at least if the United States were aware of or encouraged it beforehand. But no authority is cited to support such a conclusion or the extraordinary judicial role it portends in connection with the Nation’s foreign and immigration policies and international negotiations. Cf. Munaf 128 S.Ct. at 2223 (“Habeas does not require the United States to keep an unsuspecting nation in the dark when it releases an alleged criminal insurgent within its borders.”); Demore v. Kim, 538 U.S. 510, 522, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (“any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government”) (internal quotation marks omitted); INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (“judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations”) (internal quotation marks omitted).
*522 Moreover, the dissent’s theory necessarily would require some judicial review of a foreign nation’s legal practices and procedures. But that would contravene the longstanding principle reiterated by the Supreme Court in Munaf: “Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.” 128 S.Ct. at 2225.
Nor does the dissent explicate how its regime would work procedurally. For instance, would the Judiciary require questioning of the American and foreign officials who negotiated the transfer? Would it mandate disclosure of confidential nation-to-nation documents? Presumably so. But absent congressional direction otherwise, courts traditionally are wary of wading so deeply into this Nation’s negotiations and agreements with foreign nations. Cf. Dep’t of Navy v. Egan, 484 U.S. 518, 529-30, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988); Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).
Courts have a responsibility to decide war-related cases with as much clarity and expedition as possible. Especially in this sensitive area, our holdings and opinions should strive to be readily understandable to the political branches that have to make critical wartime decisions. The dissent’s uncertain “on behalf of’ standard likely would create years of case-by-case litigation as the courts and the political branches grapple with what it means and how it applies to a given U.S. negotiation with a foreign nation about transfer of a wartime alien detainee.
In my respectful judgment, the dissent’s theory does not advance a proper ground, absent congressional direction, for a judge to prevent the transfer of Guantanamo detainees to the custody of a foreign nation. And thus I fully agree with the opinion of the Court that the dissent’s argument provides no basis in this case for the court to second-guess the Executive’s proposed transfer of these alien detainees. See Maj. Op. at 515-16 n.*.
* * *
The opinion of the Court correctly concludes that, under current law, the U.S. Government may transfer Guantanamo detainees to the custody of foreign nations without judicial intervention — at least so long as the Executive Branch declares, as it has for the Guantanamo detainees, that the United States will not transfer “an individual in circumstances where torture is likely to result.” Munaf, 128 S.Ct. at 2226.

. The detainees advance a claim under the Foreign Affairs Reform and Restructuring Act, but that argument is unavailing. See Maj. Op. at 514-15.

. There is no meaningful distinction between (i) the Executive's declaration in this case that no Guantanamo detainees will be transferred to the custody of a foreign country where the Executive believes they would likely be tortured, and (ii) a similar Executive declaration with respect to a specific transfer (as in Mu-naf). The former encompasses the latter. In other words, for our purposes, the Government has represented that no detainee in this case will be transferred to a country where the Government believes it likely the detainee would be tortured. It bears emphasis that neither Munaf nor this case is the "more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway.” 128 S.Ct. at 2226.

. The rule of non-inquiry traditionally has not required an express executive declaration regarding the prospect of abuse by the foreign nation. After Munaf, courts in extradition cases presumably may require — but must defer to — an express executive declaration that the transfer is not likely to result in torture.

. In Boumediene v. Bush, the Supreme Court held that the Guantanamo detainees possess constitutional habeas corpus rights. —U.S. -, 128 S.Ct. 2229, 2262, 171 L.Ed.2d 41 (2008). This Court has since stated that the detainees possess no constitutional due process rights. Kiyemba v. Obama, 555 F.3d 1022, 1026-27 (D.C.Cir.2009). The detainees argue that they must possess due process rights if they have habeas rights. See Hamdi, 542 U.S. at 525-26, 124 S.Ct. 2633 (plurality opinion) (discussing interaction of habeas and procedural due process); id. at 555-58 (Sca-lia, J., dissenting) (explaining linked origins of habeas and due process). And they further contend that the due process balancing test from Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), applies here^ — rather than a lest based solely on history and tradition. See Hamdi, 542 U.S. at 529, 124 S.Ct. 2633 (plurality opinion) (applying Mathews test); see also Boumediene, 128 S.Ct. at 2283-92 (Roberts, C.J., dissenting) (applying Mathews test as articulated in Hamdi)-, but see Hamdi, 542 U.S. at 575-77, 124 S.Ct. 2633 (Scalia, J., dissenting) (criticizing application of Mathews test); Medina v. California, 505 U.S. 437, 446-48, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (applying history-based test). That Mathews/Hamdi test requires "weighing the private interest that will be affected by the official action against the Government's asserted interest, including the function involved and the burdens the Government would face in providing greater process.” Hamdi, 542 U.S. at 529, 124 S.Ct. 2633 (plurality opinion) (citation and internal quotation marks omitted).
But as explained in the opinion of the Court and in this concurring opinion, the detainees do not prevail in this case even if they are right about the governing legal framework: Even assuming that the Guantanamo detainees, like the U.S. citizens in Munaf, possess constitutionally based due process rights with respect to transfers and that the Mathews/Hamdi balancing test applies, Munaf and other precedents preclude judicial second-guessing of the Executive’s considered judgment that a transfer is unlikely to result in torture.

. The factual complication in this case arises because the United States will not send these Uighur detainees back to their home country of China, apparently because the Executive has concluded there is a likelihood of torture by China. See John B. Bellinger, III, U.S. State Dep’t Legal Advisor, Prisoners in War: Contemporary Challenges to the Geneva Conventions (Dec. 10, 2007). The detainees do not want to return to China for that same reason and thus support the Executive’s decision. Yet these alien detainees also have no constitutional or statutory right to enter the United States. Assuming the Executive has the authority to bring them into the United States, the Executive has thus far declined to do so. And the Executive apparently has not yet found a safe third country willing to accept them.

. See generally George G. Lewis & John Me-wha, History of Prisoner of War Utilization by the United States Anny 1776-1945, Dep’t of the Army Pamphlet No. 20-213, at 46, 177, 201-204, 240-43, 247, 258-60 (1955), http://cgsc. cdmhost.com; Raymond Stone, The American-German Conference on Prisoners of War, 13 Am. J. Int’l L. 406 (1919); Martin Tollefson, Enemy Prisoners of War, 32 Iowa L.Rev. 51 (1946); Mark Elliott, The United States and Forced Repatriation of Soviet Citizens, 1944— 47, 88 Political Science Quarterly 253 (1973); Howard S. Levie, How It All Started — And How It Ended: A Legal Study of the Korean War, 35 Akron L.Rev. 205 (2002); U.S. Dep’t of Defense, Final Report to Congress: Conduct of the Persian Gulf War 661-73, 703-08 (1992), http://www.ndu.edu.

. A quite different issue arises, of course, when the United States maintains physical custody of an alien detainee but moves him after he has filed his habeas petition from a place where habeas applies (such as Guantanamo) to a place where the writ does not extend for aliens (such as a U.S. military base in Germany). Cf. Rumsfeld v. Padilla, 542 U.S. 426, 440-41, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004); Ex parte Endo, 323 U.S. 283, 306, 65 S.Ct. 208, 89 L.Ed. 243 (1944).