# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 11, 2006      Decided February 9, 2007

No. 06-5126

SANDRA K. OMAR AND
AHMED S. OMAR, AS NEXT FRIENDS OF SHAWQI AHMAD
OMAR,
APPELLEES

v.

FRANCIS J. HARVEY, SECRETARY OF THE UNITED STATES
ARMY, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv02374)

———

*Gregory G. Garre*, Deputy Solicitor General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, *Gregory G. Katsas*, Deputy Assistant Attorney General, *David B. Salmons*, Assistant to Solicitor General, *Douglas Letter* and *Jonathan H. Levy*, Attorneys. *Steve*

*Frank*, Attorney, U.S. Department of Justice, entered an appearance.

*Aziz Z. Huq* argued the cause for appellees. With him on the brief were *Susan L. Burke*, *Heather L. Allred*, *Joseph Margulies*, and *Jonathan L. Hafetz*.

Before: TATEL and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion dissenting in part filed by *Circuit Judge* BROWN.

TATEL, *Circuit Judge*: In this case we have before us a petition for a writ of habeas corpus filed on behalf of Shawqi Ahmad Omar, an American citizen captured and detained in Iraq by United States military forces operating as part of the Multi-National Force–Iraq. Omar has been held under the control of United States forces for over two years, allegedly without legal process and with no meaningful access to counsel. When the district court learned of Omar's imminent transfer to Iraqi authorities for trial on terrorism charges, it issued a preliminary injunction barring transfer in order to preserve its jurisdiction to entertain the habeas petition. The government appeals, arguing that the district court lacks jurisdiction to entertain the petition and that, in any event, it had no authority to enter the preliminary injunction because Omar's transfer to Iraqi authorities would afford him all the relief he seeks, i.e., release from U.S. custody. For the reasons set forth in this opinion, we affirm.

**I.**

In late October 2004, United States military forces operating in Iraq arrested appellee Shawqi Ahmad Omar, a dual American/Jordanian citizen, at his Baghdad home. Born in Kuwait, Omar became a naturalized American citizen following his marriage to the former Sandra Kay Sulzle. According to Omar, after the overthrow of the Saddam Hussein government, he traveled to Iraq seeking reconstruction-related work and would have left by November 2004 but for his arrest and detention.

The government paints a very different picture of Omar's presence in Iraq. According to the government, U.S. military forces, operating in Iraq pursuant to U.N. Security Council Resolutions 1546 (2003) and 1637 (2004) as part of the Multi-National Force–Iraq (MNF-I), captured Omar during a raid on associates of Abu Musab al-Zarqawi. The government believes that Omar was part of Zarqawi's network and that he facilitated terrorist activities both in and outside of Iraq. The government alleges that four Jordanian foreign fighters and an Iraqi insurgent were captured along with Omar, and that weapons and improvised explosive device making materials were found in his home.

Following Omar's arrest, an MNF-I panel of three American military officers conducted a hearing to resolve his status. According to the government, the process employed by the panel exceeded the requirements of Article 5 of the Third Geneva Convention. The record, however, reveals little about the panel's operation. We know only that the panel permitted Omar to see the evidence against him, to make a statement, and to call "immediately available" witnesses. Declaration of John D. Gardner, Deputy Commanding General for Detainee Operations, Multi-National Force–Iraq,

at 3-4 (Feb. 7, 2006), *reprinted in* Joint Appendix 138-39 (hereinafter "Gardner Decl."). After the hearing, the panel declared Omar to be a "security internee under the law of war" and an "'enemy combatant' in the war on terrorism." Appellants' Br. 9. The panel also found that Omar was not a prisoner of war for purposes of the Third Geneva Convention. Since the panel's decision, American MNF-I officials have held Omar at various detention facilities in Iraq. According to Omar, the military has transferred him between Camp Cropper, the Abu Ghraib prison, and Camp Bucca. Omar has been in custody for over two years without formal charges and, he alleges, without access to counsel.

In August 2005, the MNF-I decided to refer Omar to the Central Criminal Court of Iraq (CCCI) for trial. The record indicates neither who made this decision nor what procedures were followed. The CCCI, a Baghdad-based Iraqi court, has national jurisdiction over an array of criminal offenses, including terrorism. According to the government, during the CCCI investigation and trial phases, the MNF-I maintains physical custody of detainees like Omar, turning them over to the Iraqi Ministry of Justice only after conviction.

On December 12, 2005, Omar's wife, Sandra, and son, Ahmed, filed a petition for a writ of habeas corpus as Omar's next friends. Brought in the United States District Court for the District of Columbia, the petition names as respondents Francis J. Harvey, Secretary of the Army; Major General William H. Brandenburg, then-Deputy Commanding General of Detainee Operations and Commanding General of Task Force 134, MNF-I; and Lieutenant Colonel Timothy Houser of the 105th Military Police Battalion, commanding officer at Camp Bucca. The petition asserts that Omar's detention by the United States military violates numerous constitutional provisions, chief among them the right to due process

guaranteed by the Fifth Amendment. The petition asks the district court to "[i]ssue a Writ of Habeas Corpus requiring Respondents to release Shawqi Omar from detention, and/or requiring Respondents to bring Shawqi Ahmad Omar before a court of competent jurisdiction in the United States to show just cause for his continued detention." Habeas Pet. at 17. Also alleging that "the United States military may turn Mr. Omar over to the custody of Iraqi authorities in an effort to evade the strictures of United States law," *id.* at 12-13, the petition asks the district court to "[e]njoin Respondents from transferring Mr. Omar to the authority of any other government, sovereign, country, or agency until [the district court] has an opportunity to consider and decide the merits of this Petition." *Id.* at 17.

Approximately two months after filing the petition, Omar's attorney received an e-mail from the Department of Justice informing her of the MNF-I's earlier decision to refer Omar to the CCCI. Believing that CCCI proceedings could interrupt American custody of Omar, thereby stripping the district court of jurisdiction, that transfer would amount to an illegal extradition, and that Omar would likely face torture by Iraqi authorities, the attorney sought and received an ex parte temporary restraining order requiring that Omar "not be removed from United States custody." Order Granting the Ex Parte Motion for a TRO at 2.

In a memorandum filed shortly after entry of the TRO, the government challenged the district court's jurisdiction to entertain the petition. The government relied principally on *Hirota v. MacArthur*, 338 U.S. 197 (1948), in which the Supreme Court held that World War II Japanese officials could not invoke habeas to challenge their conviction by a multinational military tribunal. The government also argued that the district court had no authority to issue injunctive relief

because doing so would "inject [the court] into an exclusive Executive function" and because adjudication of Omar's potential referral to the CCCI "raises non-justiciable political questions." Resp'ts' Opp'n to Pet'rs' Ex Parte Mot. for a TRO at 22, 25.

Following briefing, the district court converted the TRO into a preliminary injunction ordering that "the respondents . . . and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order . . . shall not remove [Omar] from United States or MNF-I custody, or take any other action inconsistent with this court's memorandum opinion." Order Granting the Mot. for a Prelim. Inj. (hereinafter "Prelim. Inj. Order"). In the accompanying memorandum opinion, the court explained that the jurisdictional issues in the case presented questions "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Omar v. Harvey*, 416 F. Supp. 2d 19, 23-24 (D.D.C. 2006) (internal quotation marks omitted) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). Fearing imminent referral to the CCCI would forever preclude a more deliberative investigation of the weighty jurisdictional questions, the court issued the injunction to freeze the status quo. In doing so, the court credited Omar's contention that transfer could irreparably deprive him of this investigation by "undo[ing the] court's jurisdiction." *Id.* at 28. This, the court concluded, "would abuse the process now put in place for the purpose of adjudicating matters on their merits." *Id.*

The government appeals, arguing (as it did in the district court) that *Hirota* controls and that Omar's challenge presents non-justiciable political questions. The government also argues that even if the district court does have jurisdiction, its

injunction was improper because, by prohibiting Omar's removal from American or MNF-I custody, it bars the government from providing Omar "all of the relief to which he is entitled through a writ of habeas corpus." Appellants' Br. 20. We consider each issue in turn.

## II.

The "great writ" of habeas corpus, as Blackstone called it, has for centuries functioned as the "symbol and guardian of individual liberty." *Peyton v. Rowe*, 391 U.S. 54, 58 (1968). By the seventeenth century, the writ had become "the highest remedy in law, for any man that is imprisoned." WILLIAM F. DUKER, A CONSTITUTIONAL HISTORY OF HABEAS CORPUS 46-49 (1980) (internal quotation marks and citation omitted). In the eighteenth century, it was the only common law writ expressly mentioned in the United States Constitution. *See* U.S. CONST. art. I, § 9, cl. 2; *Hamdi v. Rumsfeld*, 542 U.S. 507, 558 (2004) (Scalia, J., dissenting). And now, in the twenty-first century, the writ continues to protect fundamental rights as the United States confronts the challenge of international terrorism. Indeed, since September 11, the Supreme Court has considered habeas petitions filed on behalf of at least three accused terrorists, confirming "the federal courts' power to review applications for habeas relief in a wide variety of cases involving executive detention, in wartime as well as in times of peace." *Rasul v. Bush*, 542 U.S. 466, 474 (2004); *see also Hamdan v. Rumsfeld*, 548 U.S. ___, 126 S. Ct. 2749 (2006) (entertaining habeas petition of alien detained at Guantanamo Bay, Cuba); *Hamdi*, 542 U.S. 507 (plurality opinion) (entertaining habeas petition of American citizen detained within the United States).

Notwithstanding the writ's long and celebrated history, the government argues that the district court lacks jurisdiction

to consider Omar's petition. Although acknowledging both that U.S. military officials are holding Omar, Appellants' Br. 15, and that those officials operate "subject to" no independent MNF-I authority, Oral Arg. Tr. 11, the government contends that federal courts lack jurisdiction to entertain habeas corpus petitions filed by individuals detained by American military officials operating as part of a multinational force. In support, the government relies primarily on *Hirota*, in which the Supreme Court ruled that the courts of the United States had no jurisdiction to entertain habeas petitions filed by Japanese citizens convicted and sentenced by an American-led international military tribunal in Japan "set up by General MacArthur as the agent of the Allied Powers." 338 U.S. at 198. From *Hirota*, the government draws the general principle that federal courts lack habeas jurisdiction over individuals held by "United States military personnel under the auspices of a multinational force that is distinct from the United States military and ultimately derives its existence from an international body." Appellants' Br. 32. Applying that principle to this case and pointing out that Omar, like the *Hirota* petitioners, is in the custody of American officials acting as part of a multinational force, the government argues that *Hirota* "compels the dismissal of this habeas petition." Appellants' Br. 25.

Omar disagrees. Pointing out that the *Hirota* petitioners filed directly in the Supreme Court, he argues that "*Hirota*'s holding concerns the scope of Supreme Court jurisdiction under Article III of the Constitution." Appellees' Br. 29. Yet just six months after *Hirota*, in *Flick v. Johnson*, 174 F.2d 983 (D.C. Cir. 1949), we applied *Hirota* to a habeas corpus petition filed not in the Supreme Court, but in the district court by an individual who, like the *Hirota* petitioners, had been convicted by an international tribunal. In this circuit,

then, *Hirota* applies to habeas proceedings in the district court.

Omar also argues that *Hirota* "lacks vitality today" given that the Supreme Court has since "clarified the broad availability of habeas corpus." Appellees' Br. 23-24. In support, Omar cites *Madsen v. Kinsella*, 343 U.S. 341 (1952), and *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955). In both of those cases, however, the habeas petitioners had been convicted not by multinational tribunals, but rather by American tribunals sitting in foreign countries, i.e., Germany (*Madsen*) and Korea (*Toth*). Thus, neither case has anything to do with the issue the Supreme Court faced in *Hirota*. Omar also relies on *Hamdi*, 542 U.S. 507, and *Rasul*, 542 U.S. 466. Although we share Omar's view that these decisions provide a basis for questioning *Hirota*'s vitality, the Supreme Court has never revisited the precise issue it confronted there, namely the availability of habeas to non-citizens convicted abroad by multinational tribunals. As the Supreme Court has cautioned, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

That said—and setting aside Omar's suggestion that *Hirota* is distinguishable because the MNF-I may not be as authentically multinational as the Allied Forces in Japan—we agree with Omar that *Hirota* is not nearly as broad as the government insists. A nine-sentence per curiam opinion, *Hirota* reads—in its entirety—as follows:

> The petitioners, all residents and citizens of Japan, are being held in custody pursuant to the judgment of a military tribunal in Japan. Two of the petitioners have been sentenced to death, the others to terms of imprisonment. They filed motions in this Court for leave to file petitions for *habeas corpus*. We set all the motions for hearing on the question of our power to grant the relief prayed and that issue has now been fully presented and argued.

> We are satisfied that the tribunal sentencing these petitioners is not a tribunal of the United States. The United States and other allied countries conquered and now occupy and control Japan. General Douglas MacArthur has been selected and is acting as the Supreme Commander for the Allied Powers. The military tribunal sentencing these petitioners has been set up by General MacArthur as the agent of the Allied Powers.

> Under the foregoing circumstances the courts of the United States have no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed on these petitioners and for this reason the motions for leave to file petitions for writs of *habeas corpus* are denied.

338 U.S. at 198. As is apparent, *Hirota* nowhere explains which "circumstances" were controlling. Nor does anything in the opinion hold that federal courts lack habeas jurisdiction whenever, as the government insists, American officials detaining a petitioner are functioning as part of a

multinational force. Indeed, the opinion articulates no general legal principle at all. The Court, moreover, has never cited *Hirota* for any substantive proposition, much less the one the government claims it supports. None of this should be surprising given that the Court heard *Hirota* not on a petition for certiorari granted to resolve an important question of law, *see* SUP. CT. R. 38(5) (1939) ("A review on writ of certiorari . . . will be granted only where there are special and important reasons therefor."), but rather as an original petition for habeas corpus. This, together with the terse per curiam opinion, reveals a Court determined to resolve the case on the narrowest possible grounds.

We thus take the Court at its word: it lacked habeas jurisdiction because of the "circumstances" of the case. As a matter of precedent, then, *Hirota* would "control" this case only if the "circumstances" significant to the Court's decision are present here. Two circumstances are clearly the same: detention overseas and the existence of a multinational force. But two other circumstances—foreign citizenship and criminal conviction—are absent. Were we writing on a clean slate, we would thus have to determine which of these circumstances influenced the Court's decision.

But our slate is not clean. In *Flick*, we considered a habeas petition filed by a German citizen held by American troops in Germany pursuant to his conviction by an entity known as the Military Tribunal IV. 174 F.2d 983. Given *Hirota*, we asked: "Was the court which tried and sentenced Flick a tribunal of the United States?" *Id.* at 984. "If it was not," we explained, then under *Hirota*, "no court of this country has power or authority to review, affirm, set aside or annul the judgment and sentence imposed on Flick." *Id.* Concluding that the Military Tribunal IV was not, in fact, an American tribunal, we dismissed the petition.

*Flick* thus holds that the critical factor in *Hirota* was the petitioners' convictions by an international tribunal, and for good reason. Throughout its brief opinion, the *Hirota* Court repeatedly referred to the petitioners' sentences, including imprisonment and death, concluding it lacked habeas jurisdiction "to review, to affirm, set aside or annul the judgments and sentences imposed on these petitioners." *Hirota*, 338 U.S. at 198. Such language demonstrates that the Court's primary concern was that the petitions represented a collateral attack on the final judgment of an international tribunal.

Viewed in this light, *Hirota* does not control this case. Unlike the *Hirota* and *Flick* petitioners, Omar has not been charged with a crime related to the allegations now lodged against him, much less convicted of one. Omar seeks not to collaterally attack a final international conviction, but only to test the lawfulness of his extrajudicial detention in Iraq, where he has remained in the control of U.S. forces for over two years without legal process. True, a panel of three military officers found him to be a "security internee" and an "enemy combatant," but those determinations, based as they are on military considerations, are a far cry from trial, judgment, and sentencing. *See Hamdi*, 542 U.S. at 518-19 (discussing enemy combatant status); Major General George R. Fay, AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade 12 (Aug. 23, 2004), *available at* http://www.defenselink.mil/news/ Aug2004/d20040825fay.pdf (describing military definition of security internees as "[c]ivilians interned during conflict or occupation for their own protection or because they pose a threat to the security of coalition forces, or its mission, or are of intelligence value"). Habeas proceedings here run no risk, as they did in both *Hirota* and *Flick*, of judicial second-

guessing of an international tribunal's final determination of guilt.

The fact that Omar has never been convicted of criminal activity thus distinguishes this case from both *Hirota* and *Flick*, and rightly so, given that challenging extrajudicial detention is among the most fundamental purposes of habeas. "At its historical core," the Supreme Court has explained, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001); *see also Brown v. Allen*, 344 U.S. 443, 533 (1953) (Jackson, J., concurring in the judgment) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial."). Acting in tandem with its partners-in-liberty—the Due Process Clauses of the Fifth and Fourteenth Amendments—the great writ is "the instrument by which due process [can] be insisted upon by a citizen illegally imprisoned." *Hamdi*, 542 U.S. at 555-56 (Scalia, J., dissenting). Where, as in *Hirota* and *Flick*, individuals have been convicted and sentenced by a criminal tribunal, some form of judicial process has occurred, reducing the risk of unlawful extrajudicial detention. But where, as here, the Executive detains an individual without trial, the risk of unlawful incarceration is at its apex.

In addition to *Hirota*, the government cites cases holding that federal courts may not grant habeas relief to Americans held by foreign governments, *see, e.g.*, *United States ex rel. Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954), and that habeas is unavailable to Americans held in U.S. custody pursuant to a foreign conviction, *see, e.g.*, *Bishop v. Reno*, 210 F.3d 1295 (11th Cir. 2000). Such propositions, however, have nothing to do with this case since Omar is neither detained nor convicted by a foreign nation.

With *Hirota* and the other cases the government cites thus distinguished, Omar's petition fits comfortably within the terms of the modern habeas statute—a proposition the government nowhere contests. Under 28 U.S.C. § 2241, federal courts have authority to issue the writ "within their respective jurisdictions" to prisoners "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(a), (c)(1). Omar's petition satisfies both requirements. First, the petition is "within the jurisdiction" of the district court because respondents, the Secretary of the Army and two high-ranking Army officers, are amenable to service in the District of Columbia. *See Rasul*, 542 U.S. at 478-79 ("[A] district court acts within [its] respective jurisdiction within the meaning of § 2241 as long as the custodian can be reached by service of process." (second alteration in original) (internal quotation marks omitted)). Second, although American personnel in Iraq operate as part of the MNF-I, the government concedes that Omar is "held" by U.S. forces, Appellants' Br. 15, and that those forces operate "subject to" no independent MNF-I authority, Oral Arg. Tr. 11. Omar is thus "in custody under or by color of the authority of the United States." As a consequence, the district court has jurisdiction to entertain Omar's habeas petition.

## III.

The government next argues that the district court lacked jurisdiction to enter the preliminary injunction because this case "raise[s] quintessential political questions beyond the authority or competence of the judiciary to answer." Appellants' Br. 41. The political question doctrine puts beyond judicial cognizance "political decisions that are by their nature committed to the political branches." *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) (internal quotation mark omitted). For example, and relevant to this

case, the doctrine bars courts from considering claims whose adjudication would require judicial wading into foreign policy or military waters. Thus, in *Schneider* we invoked the political question doctrine to dismiss a claim that would have required us to second-guess U.S. policy towards Chile. *Id.* at 197-98. Similarly, in *Bancoult v. McNamara*, 445 F.3d 427, 436-37 (D.C. Cir. 2006), we dismissed a complaint that would have required us to review the manner in which the United States established a military base in the Indian Ocean. Here, the government argues that Omar's petition would likewise require the court to interfere with the "Executive's textual constitutional authority to implement foreign policy and military functions for the purpose of protecting national security." Appellants' Br. 43.

As the political question doctrine is one "of 'political questions,' not one of 'political cases,'" *Baker v. Carr*, 369 U.S. 186, 217 (1962), we must focus on Omar's specific claims. First, he challenges his detention, claiming that U.S. military officials are holding him in violation of the Constitution, federal law, Army regulations, and international law. Critically for present purposes, Omar alleges that he is held in violation of the Due Process Clause of the Fifth Amendment because his "arrest and arbitrary, indefinite detention without process . . . violates . . . [his] 'interest in being free from physical detention by one's own government.'" Habeas Pet. at 13 (quoting *Hamdi*, 542 U.S. at 529). Second, he challenges his transfer, arguing both that the military lacks treaty or statutory authorization to transfer him to Iraqi authorities and that the U.S. Constitution forbids transfer to a government likely to torture him.

The Supreme Court's recent decision in *Hamdi* makes abundantly clear that Omar's challenge to his detention is justiciable. In *Hamdi*, as here, the petitioner challenged his

detention by U.S. military authorities pursuant to an "enemy combatant" determination. Although the government never directly invoked the political question doctrine, it argued that separation of powers concerns—the very concerns underlying the political question doctrine—preclude courts from inquiring into the factual basis of an enemy combatant designation. "A commander's wartime determination that an individual is an enemy combatant," the government urged, "is a quintessentially military judgment representing a core exercise of the Commander-in-Chief authority." Br. for the Resp'ts at 25, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (No. 03-6696). Unequivocally rejecting this contention, the *Hamdi* plurality explained that "it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here." *Hamdi*, 542 U.S. at 535.

Omar's challenge to his transfer is equally justiciable. He argues (1) that the military may not transfer him to Iraqi authorities without treaty or statutory authorization, and (2) that the military lacks such authorization. In the extradition context, of course, treaty or statutory authorization has long been required, *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 8 (1936) ("[A]lbeit a national power, [authority to extradite] is not confided to the Executive in the absence of treaty or legislative provision."), and we have some reason to believe this rule applies beyond the extradition context, *see Wilson v. Girard*, 354 U.S. 524, 528-30 (1957) (per curiam) (permitting in-country transfer of American service member to Japanese custody after noting that an agreement authorized by a treaty provided for transfer).

Our decisions in *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), and in countless other cases make clear that courts

may determine whether the Executive possesses the necessary authority for transfer—the second of the two questions Omar raises. In *Holmes*, American soldiers convicted by a German court of attempted rape escaped U.S. military custody, returned to the United States, and then sought to prevent the military from transferring them to German custody. *Id.* at 1214. In support, they argued (among other things) that they were "surrenderable only pursuant to the terms of an extradition treaty." *Id.* at 1219 n.59. Although ultimately rejecting the petitioners' authorization claim, we first satisfied ourselves that a valid treaty in fact authorized the transfers. *Id.*; *see also Neidecker*, 299 U.S. at 18 (denying extradition after determining that "the treaty with France fails to grant the necessary authority").

The antecedent question—whether Omar's transfer even requires treaty or statutory authorization—is also fully justiciable. On the merits, the government will surely argue that under Article II of the Constitution, the military needs no express authority to transfer detainees like Omar. Resolving this claim will involve difficult questions of constitutional law—questions which, significantly for our purposes, will require no judicial intrusion into the exclusive domain of the political branches. To be sure, a decision on the merits might well have *implications* for military and foreign policy, but that alone hardly makes the issue non-justiciable. For example, in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the government's assertion that wartime seizure of steel mills was "necessary to avert a national catastrophe which would inevitably result from a stoppage of steel production," *id.* at 582, failed to prevent the Supreme Court from deciding whether the President may seize private property without congressional authorization. Likewise, in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), the Court, despite the obvious implications for U.S.

foreign policy, decided whether the President could constitutionally issue export controls on munitions absent specific statutory authorization. In each of these cases, the Court resolved a fundamental question of Executive authority without making any foreign policy or military judgments of its own. This case, like *Youngstown* and *Curtiss-Wright* and unlike *Schneider* and *Bancoult*, *supra*, presents constitutional issues that courts can resolve without making any judgments about foreign policy or the war in Iraq.

Finally, the "rule of non-inquiry," which bars courts from "investigating the fairness of a requesting nation's justice system," *In re Extradition of Howard*, 996 F.2d 1320, 1329 (1st Cir. 1993), does not require a different result. According to the government, Omar's allegation that he faces torture at the hands of the Iraqis is precisely the type of claim the rule of non-inquiry bars courts from considering. This may be correct. *See, e.g.*, *In re Extradition of Manzi*, 888 F.2d 204, 205-06 (1st Cir. 1989) (permitting extradition to Italy and refusing to allow evidence on the petitioner's claim that his life would be threatened by the transfer). *But see Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960) (suggesting in dicta that there may one day arise a transfer so "antipathetic to a federal court's sense of decency as to require reexamination of" the rule of non-inquiry). But since the only question before us at this stage of the litigation relates to the district court's jurisdiction, and given our earlier conclusion that the political question doctrine presents no jurisdictional bar to Omar's challenge to his detention and transfer, we need not address his torture claims. The rule of non-inquiry therefore has no relevance to our disposition of the matter before us at this stage of the litigation.

**IV.**

Having established that the district court has jurisdiction, we turn to the propriety of the preliminary injunction. Applying the standard four-factor analysis, *see Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (listing requirements for preliminary injunctions), the district court enjoined Omar's removal from American or MNF-I custody in order to preserve its jurisdiction to address the case's "serious, substantial, difficult, and doubtful" issues. 416 F. Supp. 2d at 28 (internal quotation marks omitted) (quoting *Holiday Tours*, 559 F.2d at 844).

The government challenges the injunction, claiming that the district court improperly barred Omar's outright release even though such release is precisely what his "petition ultimately seeks." Appellants' Br. 57. The injunction, in relevant part, orders that the respondents "shall not *remove* the petitioner from United States or MNF-I custody." Prelim. Inj. Order (emphasis added). Although "remove" could include outright release, given the circumstances of this case, we interpret the word differently. Omar did not seek an injunction barring his outright release, nor could he have; he sought an injunction prohibiting his transfer to Iraqi authorities in order to preserve the district court's jurisdiction to entertain his habeas petition. We thus understand the court to have used the word "remove" to prevent Omar's transfer *in any form*, whether by an official handoff or otherwise. Viewed this way, the injunction does not bar a bona fide release of Omar, even if the military releases him inside Iraq.

The government's primary challenge to the injunction (other than the jurisdictional arguments we have rejected in parts II and III), is its claim that transfer to Iraqi authorities constitutes release from American/MNF-I custody—"all of

the relief to which [Omar] is entitled through a writ of habeas corpus." Appellants' Br. 20. The government asserts that transfer is release because transfer "would end his detention by the MNF-I, which is the sole arguable basis for the district court's jurisdiction." Appellants' Br. 58. In other words, the government sees transfer as a subset of release; one can be "released" either by being let go into the open, or by being transferred to a different authority.

There is, however, an obvious and quite significant difference between transferring Omar to Iraqi authorities and releasing him to walk free from his current detention. If transferred, Omar would remain in custody and detention; if released he might not. Indeed, were the government correct, federal courts would have no authority to stay an extradition long enough to test its validity since transfer to the foreign authority would, as the government sees it, be the same as release. Yet courts routinely stay extraditions, *see, e.g.*, *Ntakirutimana v. Reno*, 184 F.3d 419, 423 n.7 (5th Cir. 1999) (stay of extradition pending appeal); *Then v. Melendez*, 92 F.3d 851, 853 n.1 (9th Cir. 1996) (same), and for good reason: transferring a petitioner to the foreign country seeking extradition is obviously not the same as releasing him.

To be sure, as the government argues, Iraqi authorities might arrest Omar the moment U.S. forces release him. Expanding on this point, the dissent speculates that "if the government simply releases Omar and allows him to walk out of Camp Bucca, he might well find a dozen armed Iraqi soldiers waiting for him." Dissenting Op. at 6. The dissent also thinks that U.S. military officials could "notify Iraqi authorities as to the exact time and place of [his] release, thereby effectively ensuring his immediate recapture and detention." *Id.* As a result, the dissent maintains, Omar has failed to demonstrate irreparable injury because even if he

prevails at his habeas hearing, he may nonetheless end up in Iraqi custody.  We disagree.

To begin with, such speculation at the appellate level cannot defeat Omar's right to a habeas hearing on the lawfulness of his detention and transfer.  *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995) ("We review a district court decision regarding a preliminary injunction for abuse of discretion . . . .").  At this point in time, we have no way of knowing how the U.S. military would release Omar if the district court ultimately rules in his favor, much less whether and to what extent the military would communicate with Iraqi authorities.  Nor do we have any idea what would happen to Omar once released.  Perhaps he would end up in Iraqi custody, but perhaps he would not.  For example, perhaps because of developments at the habeas hearing, such as the appearance of defects in the government's case or the introduction of exculpatory evidence, the Iraqis would decide that Omar is no longer worth prosecuting.  Or perhaps by the time the district court ordered Omar's release, Iraqi priorities would have changed, leaving Iraqi authorities uninterested in allocating scarce military resources—much less the dissent's dozen soldiers—to his arrest.  The point is that on the record before us at this stage of these proceedings, neither the government nor the dissent nor we can possibly know what would happen to Omar if the district court barred his transfer and ordered his release.  Given this uncertainty, a preliminary injunction protecting Omar from the *certainty* of transfer now is hardly an "empty gesture."  *See* Dissenting Op. at 7.

The dissent's speculation about a U.S. military "tip-off" to the Iraqis suffers from a second defect.  If the district court ultimately rules that the U.S. military lacks authority to transfer Omar, the military will be unable to transfer him

either directly through a formal handoff or indirectly by "releasing" him with a wink-and-a-nod to the Iraqis. The United States may certainly share information with other sovereigns, *see id.* at 6-7, but it may not do so in a way that converts Omar's "release" into a transfer that violates a court order. The district court has jurisdiction to hear Omar's habeas petition, *see* part III *supra*, and federal courts have authority to enforce their orders; contrary to the dissent, *see* Dissenting Op. at 6, the political question doctrine is not implicated. In any event, we think it exceedingly unlikely that American military officers, sworn to uphold the law and represented by the Justice Department, would evade an order of a United States district court. Indeed, if the district court orders Omar's release, we are confident that military officials and their lawyers will work in good faith with the district court to fashion an order that, based on then-existing circumstances, ensures his lawful release from American custody.

The government's observation that "a court may not artificially prolong a case or controversy by issuing an injunction the effect of which is to prevent the Government from rendering the petition moot by granting relief," Appellants' Br. 57, though undoubtedly correct, has nothing to do with the issue before us. Because the military plans to transfer Omar to Iraqi authorities, not to release him, the preliminary injunction, far from "prevent[ing] the Government from rendering the petition moot by granting relief," preserves the district court's jurisdiction to review the lawfulness of that transfer.

The government cites *Spencer v. Kemna*, 523 U.S. 1 (1998), for the proposition that a prisoner's final release from prison moots his habeas petition. It also cites a series of cases, including *Yohey v. Collins*, 985 F.2d 222 (5th Cir.

1993), for the proposition that conviction moots a pre-trial habeas petition. Omar, however, has not been released nor has he been convicted of a crime, so the cited decisions have no bearing on this case.

Taking a different tack, the dissent believes Omar has failed to demonstrate likelihood of success on the merits because "to make an injunction against transfer to Iraqi authorities a viable form of preliminary relief, Omar would need to show . . . . [what] we might call 'release plus,'" i.e., "release combined with immunity to Iraqi prosecution, release following surreptitious transport out of Iraq, or release with a promise to conceal the time and place of the release." Dissenting Op. at 8. Like the dissent's other arguments, this argument is wholly speculative, for it assumes, without record support, that Omar will, once released, require protection from Iraqi authorities. But as we indicate above, no one knows at this time what will happen to Omar if the district court orders his release. Speculating about the conditions under which the military might release Omar or the lawfulness of those conditions is thus not only premature—the matter may never arise—but irrelevant to the issue before us: whether the district court abused its discretion in issuing the injunction. In any event, Omar's petition does not seek "release plus"; rather, alleging that Omar is being held by the U.S. military in violation of his constitutional rights, the petition seeks his release from military custody.

The dissent asserts that "interference by a court in the decisions of sovereigns acting jointly within the same territory is unprecedented," Dissenting Op. at 9-10, citing only *Floyd v. Henderson*, 456 F.2d 1117 (5th Cir. 1972), in support. In *Floyd*, a federal prisoner argued that the federal government could no longer exercise jurisdiction over him because the Attorney General had transferred him to a state prison, where

he served a state sentence concurrently with his federal sentence. Because a statute, 18 U.S.C. § 4082, authorized the Attorney General to assign federal prisoners to state prisons, the court ruled that "[the statutory] authority is sufficient to permit the transfer of petitioner from one institution to another prison." 456 F.2d at 1119. But as we have explained, whether the military has authority to transfer Omar is one of the central questions in this habeas litigation. *Floyd* and the proposition for which the dissent cites it would thus become relevant only if the district court rules either that the military possesses the requisite statutory or treaty authority to transfer Omar, or that no such authority is necessary.

According to the dissent, "the bar on Omar's presentation before the CCCI while in United States custody is improper." Dissenting Op. at 5. Although we agree with the dissent that the injunction prohibits the military from presenting Omar to the CCCI for trial, we think this an appropriate exercise of the district court's discretion. The dissent's argument hinges on the assumption, unsupported in the record, that Omar's "presentation does not hamper the ability of the government to order Omar's release should the district court rule in his favor." *Id.* Although the government has advised us that the "MNF-I maintains physical custody of detainees while their cases are being heard by the CCCI," Gardner Decl. at 6, we cannot determine from the record whether this means *legal* custody. We are thus uncertain whether once Omar is in a CCCI courtroom, the Iraqi judge could remand him to Iraqi custody, an action that would obviously defeat the district court's habeas jurisdiction. Nor can we determine whether Omar's presentation for trial might by itself amount to the very "transfer" that Omar argues the military lacks authority to execute. Given these uncertainties and their potential implications for habeas jurisdiction, the district court, by

enjoining Omar's presentation for trial, clearly acted within its discretion.

Pointing out that "American citizenship is not a grant of immunity to commit crimes in other countries with impunity," the dissent thinks our decision has the "remarkable effect of enabling a court sitting in Washington, D.C., to block the efforts of a foreign sovereign to make an arrest on its own soil." Dissenting Op. at 9. U.S. courts, of course, have no authority to constrain the actions of Iraqi authorities. But in this case the government concedes that Omar is in the custody of United States officials, and Omar's petition merely calls on the district court to determine whether those officials are complying with American law—an altogether unremarkable action for a United States district court.

## V.

In sum, neither *Hirota* nor the political question doctrine deprives the district court of jurisdiction to entertain Omar's petition for a writ of habeas corpus. Because transfer would not afford Omar all the relief he could obtain through a writ of habeas corpus and because the district court's preliminary injunction properly preserves its jurisdiction to entertain his petition, we affirm.

*So ordered.*

BROWN, *Circuit Judge*, *dissenting in part*: With only minor hesitation,[1] I join the majority's analysis of the district court's jurisdiction over Omar's habeas petition. But I disagree with the majority's view that, while the district court cannot enjoin Omar's release outright, it may indeed dictate the *terms* of his release. Hence, I write separately to explain why I would vacate the district court's injunction.

I

This case reached us when the government appealed the district court's Order dated February 13, 2006. The sole question before us, then, is whether that Order was proper. In relevant part, it states as follows:

> [It is] ORDERED that the motion for a preliminary injunction is GRANTED, and it is

> FURTHER ORDERED that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, shall not remove the petitioner from United States or MNF-I custody, or take any other action inconsistent with this court's memorandum opinion.

---

[1] To the extent the majority's opinion might be read to imply citizenship was one of the determinative factors in *Hirota v. MacArthur*, 338 U.S. 197 (1948), I note the question remains open in this circuit. *Compare Flick v. Johnson*, 174 F.2d 983, 984 (D.C. Cir. 1949) (focusing on conviction by a foreign tribunal as the hallmark of *Hirota* without discussing citizenship), *with* Maj. Op. 9 (describing the issue in *Hirota* as "the availability of habeas to non-citizens convicted abroad by multinational tribunals").

The Motion for a Preliminary Injunction referenced by the Order was originally styled a Motion for a Temporary Restraining Order, and it asked the court to prevent "the transfer of Shawqi Omar to the authority of any other government, sovereign, country, or agency until this Court has an opportunity to consider and decide the merits" of Omar's habeas petition.

The injunction, by its terms, grants the original Motion, thereby barring Omar's transfer to different custodians. The injunction also explicitly instructs the respondents not to "remove [Omar] from United States or MNF-I custody," an act necessary for his release.[2] Finally, the discussion in the district court's memorandum opinion makes sense only if the court further intended to proscribe Omar's presentation before the Central Criminal Court of Iraq ("CCCI"), even while he remained in the custody of the United States or MNF-I. The Order gives effect to this intention by enjoining "any other action inconsistent with this court's memorandum opinion." In summary, the injunction bars Omar's transfer to a foreign custodian, his outright release, and his presentation before the CCCI while within United States or MNF-I custody.[3]

---

[2] The majority interprets this instruction as covering transfer but not release. Maj. Op. 19. Given such an interpretation, it is not clear why the district court had to "FURTHER ORDER[]" that Omar not be removed, when the court's grant of Omar's Motion for a Preliminary Injunction already barred his transfer. However, since the majority finds that an injunction against release was not intended, and I find that it was intended but improper, we all agree that the United States is free to release Omar from custody.

[3] Indeed, as the government has recognized, the final portion of this injunction effectively bars Omar's *prosecution* by the CCCI, as well. *See* Opp'n to Pet'rs' Emergency Mot. for Injunctive Relief at 18-19, *Munaf v. Harvey*, No. 06-5324 (D.C. Cir. Oct. 25, 2006) ("[Omar] has not yet had a trial or even an investigative hearing in the

3

II

In addressing the propriety of this injunction, I note first that we heard arguments in this case on the portentous date of September 11, 2006, precisely five years after the terrorist attacks that so fundamentally altered this country's attitude toward security. No longer could we sit back and consider ourselves safe from foreign enemies so long as no other *nation* wished us harm. The Founders envisioned wars in the paradigm of the time, with official declarations from heads of states announcing the beginning and end of hostilities. In today's world, by contrast, global alliances of non-state actors can visit death and destruction on the American homeland without warning, on a scale equal to that seen in conventional wars. In such an environment, it would be dangerous folly to deny what this case involves: the capture of an alleged enemy combatant by American military personnel operating in a war zone. It is in this context that we must measure Omar's likelihood of succeeding in his habeas petition, the harm the injunction imposes on the respondents, and the interest of the public in the case.[4]

---

CCCI due to the district court's unprecedented injunction in that case.").

[4] Were this an isolated case, the district court's cavalier approach to the difficult questions it presents would be less worrisome. But in fact several related cases have recently come before this court, with many more sure to follow. *See, e.g.*, *Al-Bandar v. Bush*, No. 06-5425, 2006 U.S. App. LEXIS 32239 (D.C. Cir. Dec. 29, 2006) (non-citizen seeking habeas after conviction in Iraq); *Munaf, supra* note 3 (U.S. citizen seeking habeas after conviction in Iraq). The proper contours of court jurisdiction in such cases remain unclear, as do the rights to be accorded the petitioners on the merits. In such circumstances, this court has a duty to provide clear guidance based on the cases presented for its consideration.

While the test for preliminary injunctions is a flexible one—a strong showing on the merits may compensate for a relatively slight showing of irreparable injury—a petitioner must nonetheless demonstrate "some injury." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (internal quotation marks omitted) (quoting *Population Inst. v. McPherson*, 797 F.2d 1062 app. at 1078 (D.C. Cir. 1986)). Specifically, we ask whether the petitioner "would suffer irreparable injury if the injunction is not granted." *Id.* at 746. Thus, if the injunction would not reduce the risk of the feared injury—whether because the injury would not occur even absent the injunction or because it would remain equally likely even with the injunction in place—the injunction should not be granted. In particular, when the feared injury is the loss of a remedy the petitioner seeks from the courts, we must determine whether the action to be enjoined would preclude or impair the desired relief, and, if so, whether the petitioner is likely to obtain that relief on the merits.

To state this rule is to demonstrate immediately that the injunction should be vacated at least to the extent it operates to bar Omar's release. Release would provide Omar with all the relief to which he might be entitled by way of his habeas petition. While courts do have power to grant equitable habeas remedies beyond mere release, Omar has demonstrated no grounds whatsoever for such remedies. Equitable remedies typically involve either an order to a custodian to ameliorate the conditions of a petitioner's detention, *e.g.*, *Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953), or an order freeing a petitioner from penalties resulting from conviction that persist beyond the end of detention, *e.g.*, *Carafas v. LaVallee*, 391 U.S. 234 (1968). Release from detention trumps ameliorated detention, and Omar has pointed to no statutory penalties that would persist after his release. *Cf. Lane v. Williams*, 455 U.S. 624, 631-33 (1982) (limiting the *Carafas* exception to "civil disabilities" imposed

on former detainees by operation of law). Thus, if Omar prevails on his habeas petition, he would be released and nothing more, and release at this early stage of the proceeding would only *accelerate* that relief, not impair it. In such circumstances, the district court's action blatantly violates the rule that injunctions must be "narrowly tailored to remedy the harm shown." *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990).

Similarly, the bar on Omar's presentation before the CCCI while in United States custody is improper. Provided such presentation does not hamper the ability of the government to order Omar's release should the district court rule in his favor, it presents no impediment to relief Omar might receive. While it might be argued that *conviction* by the CCCI would prevent Omar's release, the same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution in order to preempt such non-reviewable adjudications. *Cf. Hirota v. MacArthur*, 338 U.S. 197, 197 (1948); *Neely v. Henkel*, 180 U.S. 109, 123 (1901).

Omar concedes the district court cannot enjoin his release, *see* Appellees' Br. 47, and his briefs before us barely address the bar on his presentation before the CCCI. However, Omar dedicates much more energy to his argument that the remaining portion of the injunction—the bar on his transfer to a new custodian—should be enforced. The propriety of this part of the injunction is unquestionably the closest question before us.

If this portion of the injunction stands by itself, then the government will be permitted to release Omar, but not to transfer him to Iraqi control. But just how far may the courts go in effectuating such an order? Because Omar seeks an injunction against his transfer to Iraqi authorities, we have to

assume that the United States seeks to transfer him to Iraqi authorities and that Iraqi authorities seek to gain custody. Therefore, if the government simply releases Omar and allows him to walk out of Camp Bucca, he might well find a dozen armed Iraqi soldiers waiting for him. This possibility becomes an inevitability if United States military officials notify Iraqi authorities as to the exact time and place of Omar's release, thereby effectively ensuring his immediate recapture and detention. The majority calls this reasoning speculative, but it is precisely the sort of consideration of future likelihoods that is required of a court when it weighs the propriety of preliminary relief. *CityFed*, 58 F.3d at 746. In short, the practical effect of Omar's release with a tip-off to Iraqi authorities would be indistinguishable from his formal transfer to those authorities. Therefore, absent a limitation on intergovernmental communication, an injunction against transfer will have no significant effect on the likelihood of Omar's detention by Iraq subsequent to his release from United States custody.

But information sharing among sovereigns regarding the location of persons subject to arrest is a common and desirable practice, particularly in a situation like that in present-day Iraq, where the United States military is cooperating with Iraqi authorities to secure the country. Any judicial order barring this sort of information sharing in a military zone would clearly constitute judicial interference in a matter left solely to Executive discretion and would hence be improper under the political question doctrine. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality opinion) ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."); c*f. Bancoult v. McNamara*, 445 F.3d 427, 436-37 (D.C. Cir. 2006); *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005). Thus, the courts are powerless to enjoin the United States from informing

Iraqi officials about the planned release of Omar, and under these circumstances, an injunction against outright transfer is an empty gesture that cannot be sustained. *See CityFed*, 58 F.3d at 746.

The majority recognizes the practical equivalence between transferring Omar and "'releasing' him with a wink-and-a-nod to the Iraqis," Maj. Op. 22, but draws the opposite conclusion. The majority's logic proceeds as follows: (1) An injunction barring transfer is permissible. (2) Unrestricted inter-governmental communication could convert release into transfer. (3) Therefore, federal courts must have the power to limit intergovernmental communication, in order to give effect to the main injunction against transfer. Summarizing its position, the majority declares: "The United States may certainly share information with other sovereigns . . . , but it may not do so in a way that converts Omar's 'release' into a transfer that violates a court order." *Id.* This is a striking conclusion. The majority in effect holds that, in the proper circumstance, a single unelected district court judge can enjoin the United States military from sharing information with an allied foreign sovereign in a war zone and may do so with the deliberate purpose of foiling the efforts of the foreign sovereign to make an arrest on its own soil, in effect secreting a fugitive to prevent his capture. The trespass on Executive authority could hardly be clearer.

III

To obtain injunctive relief, the moving party "must demonstrate 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *CityFed*, 58 F.3d at 746. The first

two factors clearly favor the government here, and the district court's findings in favor of Omar on the remaining two factors are dubious at best.

With regard to the first factor—Omar's likelihood of succeeding on the merits—we must first determine *in what sense* he must be likely to succeed. It may be true that he is likely to succeed on the merits *if all he seeks from his habeas petition is release with no additional protections*, but then the United States would be free to notify Iraqi officials of the time and place of his release, effectively ensuring Iraqi detention. Omar's "success on the merits," in that case, would be Iraqi detention, and an injunction against transfer would not be necessary. Therefore, to make an injunction against transfer to Iraqi authorities a viable form of preliminary relief, Omar would need to show some likelihood of obtaining permanent relief protecting him from Iraqi custody. This remedy we might call "release plus," consisting of release combined with immunity to Iraqi prosecution, release following surreptitious transport out of Iraq, or release with a promise to conceal the time and place of the release. But Omar has asserted no legal grounds justifying such an extraordinary remedy, and even had he done so, it would be beyond the court's power to grant. Imposing such conditions on Omar's release would substantially interfere with the Executive's prerogative, especially in time of war. Thus, the first factor favors the government.

In an attempt to show that the district court's bar on Omar's transfer to the Iraqi authorities would indeed secure Omar's chance at some better outcome on the merits, the majority draws an analogy between that injunction and garden-variety stays on extradition. *See* Maj. Op. 20. As the majority notes, "transferring a petitioner to the foreign country seeking extradition is obviously not the same as releasing him." *Id.* But Omar is physically detained *in Iraq*. Therefore, transfer in this

context is not akin to extradition. *Cf. Ntakirutimana v. Reno*, 184 F.3d 419 (5th Cir. 1999); *Then v. Melendez*, 92 F.3d 851 (9th Cir. 1996). Rather, "transfer" here means simply allowing Iraqi officials to arrest and take custody of a person who was captured in Iraq and has remained there continuously—something they undeniably have a right to do. "A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction," *Wilson v. Girard*, 354 U.S. 524, 529 (1957),[5] and American citizenship is not a grant of immunity to commit crimes in other countries with impunity, *Neely*, 180 U.S. at 123. As noted, the majority's holding has the remarkable effect of enabling a court sitting in Washington, D.C., to block the efforts of a foreign sovereign to make an arrest on its own soil. Where, as is true here, the prisoner is physically in the territory of the foreign sovereign that seeks to make the arrest, release is tantamount to transfer, and thus the logic underlying stays on extradition does not apply. The majority's contrary view is comparable to a court enjoining state authorities from lodging a detainer with respect to a prisoner held in federal custody and then requiring the federal prison officials to release the prisoner in a way that protects the prisoner from state arrest. Such interference by a

---

[5] To the extent the majority reads *Girard* as permitting in-country transfer of an American service member to foreign custody only if a treaty or similar international agreement provides for the transfer, *see* Maj. Op. 16, the majority misreads that opinion. In *Girard*, the Court did not describe any treaty or agreement providing for the transfer of the detainee, and it would be odd to hold that a foreign sovereign needs the authorization of an international agreement to take custody of someone detained in its own territory or that the United States needs such authorization to release the detainee in compliance with the foreign sovereign's wishes. Significantly, the *Girard* Court reversed an injunction against transfer very much like the one at issue here. *Girard*, 354 U.S. at 526, 530.

court in the decisions of sovereigns acting jointly within the same territory is unprecedented. *Cf. Floyd v. Henderson*, 456 F.2d 1117, 1119 (5th Cir. 1972) ("[The state prisoner] could not complain about being returned [from state custody] to federal prison, because the question of jurisdiction and custody over a prisoner is one of comity between governments and not a personal right of the prisoner.").

The second *CityFed* factor, the risk of "irreparable injury" to Omar if the injunction is not granted, likewise favors the government. Irreparable injury must be measured in terms of the relief the litigant ultimately seeks, and as outlined above, the preliminary injunction against transfer does not alter in any way the likelihood Iraqi authorities will take Omar into custody if he ultimately prevails on the merits of his petition and gains his release from United States custody. Thus, the claimed "irreparable injury" (Iraqi custody) is not different from the most likely consequence of the relief Omar is pursuing. Only if Omar is seeking not just release, but release with protection from Iraqi custody, can he argue transfer to Iraqi authorities poses a threat of irreparable injury. But as noted, Omar has not established any legal basis for protection from Iraqi custody.[6] It simply defies logic for a court to conclude Omar needs a preliminary injunction to protect him from the consequences of the relief he is ultimately seeking. Similarly, while the district court treated loss of habeas jurisdiction as a second irreparable injury, this is truly injurious only to the extent the exercise of

---

[6] I do not make light of Omar's assertion he will receive severe treatment as a result of Iraqi detention. To recognize that our courts lack the authority to dictate the actions of a foreign sovereign is not to sanction human rights violations. As part of a tripartite system of government, we need not assume the political branches are oblivious to these concerns. Indeed, the other branches possess significant diplomatic tools and leverage the judiciary lacks.

jurisdiction might produce relief beyond release into Iraqi custody, and (once again) no such additional relief could be warranted.

The third factor queries the injuries other parties might sustain as a result of the injunction. Here, the substantial impairment to the Executive's ability to prosecute the war efficiently and to make good on its commitments to our allies cannot be denied. Given the gravity of such impairment in these troubled times, the third factor places much on the government's side of the ledger.

Finally, the fourth *CityFed* factor asks the district court to weigh the balance of public interest. The same concerns raised by the third factor apply here and render suspect a finding that, in the present environment, the balance of public interest favors limiting Executive discretion to transfer Omar.

The district court couched its analysis in terms of the *CityFed* factors but followed an entirely different path. The court did not address the merits of Omar's underlying habeas claim or discuss what relief would justify each portion of the injunction. Rather, the court merely determined that it *might* have jurisdiction over Omar's habeas petition and then deemed this possibility sufficient to satisfy the first *CityFed* factor. *Omar v. Harvey*, 416 F. Supp. 2d 19, 23-28 (D.D.C. 2006). Addressing the second factor, the court treated its potential loss of jurisdiction as an irreparable injury without explaining how its retention of jurisdiction could provide Omar with relief that would somehow preclude his being taken into Iraqi custody. *Id.* at 28-29. Even assuming deference requires us to uphold the district court's findings on the final two factors, *see CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005), its analysis of the first two is clearly erroneous, and its overall

weighing of the *CityFed* factors represents an abuse of discretion.

IV

I agree with the majority that the district court has jurisdiction to entertain Omar's petition for a writ of habeas corpus. However, because each part of the district court's injunction—the bar on Omar's release, the bar on his transfer to a separate custodian, and the bar on his presentation before the CCCI while he remains in United States or MNF-I custody—is improper, I would vacate the injunction. Thus, in relation to however much of the injunction the majority affirms, I must respectfully dissent.